14 P.3d 378

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Jose SANTANA, Defendant–Appellant.**

No. 24938.

Court of Appeals of Idaho.

Aug. 16, 2000.

Review Denied Dec. 11, 2000.

Wiebe Fouser, Canyon County Public Defenders; Thomas A. Sullivan, Deputy Public Defender, Caldwell, for appellant. Thomas A. Sullivan argued.

Hon. Alan G. Lance, Attorney General; Karen A. Hudelson, Deputy Attorney General, Boise, for respondent. Karen A. Hudelson argued.

SCHWARTZMAN, J.

Jose Santana appeals from his conviction and sentence for first degree murder and use of a deadly weapon. We affirm.

## I.

### FACTS AND PROCEDURE

On October 16, 1994, at approximately 9:40 p.m., Jose Hernandez was shot in his abdomen with a rifle. A white car and a white van were observed speeding away from the scene. The white van had a "Camionetas Santana" business emblem on its side.[1]

Officer Troy Evans of the Nampa Police Department arrived on the scene to find Hernandez still alive. Officer Evans asked Hernandez if he had been shot, to which Hernandez replied, "Yes." Hernandez was asked what his own name was and he replied, "Santana." Hernandez was asked who shot him and he said, "Santana." Hernandez was transported to a local hospital, but died from internal bleeding and organ damage during attempts to save his life. An autopsy of Hernandez revealed that he had cocaine and methamphetamine in his system.

The driver of the white car, Jose Coloca, eventually came forward to tell police that he was the driver and that Hernandez had been his passenger. He stated that on that night, they were followed by a white van that flashed its headlights until they stopped. Santana got out of the driver's side of the van, approached Coloca's car, engaged Hernandez in a conversation and requested that Hernandez step out of the car. Coloca testified that Santana was wearing a long brown coat, cowboy boots and a cowboy hat. Santana had medium length hair and a moustache.

1. Santana ran a business that transported legal Mexican immigrants from Mexico to Idaho and returned Mexican citizens, whether illegal or legal, to Mexico from Idaho.

Through his rear view mirror, Coloca observed Santana and Hernandez engaged in, what appeared to be, a friendly conversation until he heard arguing. Coloca saw Santana reach into the passenger's side door of the van and pull out what looked like a rifle. Coloca heard a gunshot and Hernandez cry out; he immediately drove away, but watched through his rear view mirror as Santana's van drove away in the opposite direction.

Michael Krause, a resident of the vicinity of the shooting, heard the gunshot as he was watching television in his home. As Krause ran to the back door, he saw a white van speeding away. Upon exiting through the door, Krause almost ran into a Hispanic man who was wearing a dark colored, medium-length jacket and looked "fearful." Krause saw the man holding something that was long and rigid close to his body, under his coat. Before trial, Krause picked Santana's picture out of a valid photo line-up.

Santana was later apprehended in Las Vegas, Nevada. The state thereafter charged Santana with first degree murder, I.C. §§ 18–4001–4003, and use of a deadly weapon, I.C. § 19–2520. Santana entered a plea of not guilty and a jury trial was scheduled to begin on June 17, 1996. On that day, after jury selection had been completed, counsel for both parties met in chambers with presiding Judge Gutierrez to discuss some concerns with the previously conducted voir dire.

During voir dire, potential jurors were asked, "Have any of you, or any members of your immediate family ever been charged with a felony crime?" Juror S.O. did not raise her hand and was eventually passed for cause by the state. Neither party used a peremptory challenge and she was seated on the jury. The jury was sworn. Thereafter, Judge Gutierrez learned that S.O. had not revealed during voir dire that her husband was currently being prosecuted by the state for a felony offense. The state moved to disqualify S.O. for implied bias and the defense objected. The court denied the state's motion, but reopened voir dire—presumably to allow inquiry into the existence of actual bias.

The court allowed the parties to further voir dire S.O., who admitted that she knew her husband was being charged with a crime, but did not know what type. She stated that she was currently separated from him, but admitted that they still lived together with their children. She stated that she did not have any knowledge of the crime itself and that she did not respond to the court's inquiry the day before because she thought the charge against her husband was not a felony. The court refused to strike S.O. for cause, finding that she could remain impartial. However, Judge Gutierrez subsequently disqualified himself because of familiarity with members of the victim's family and the case was reassigned to Judge Weston.

The state renewed its objection to S.O. based upon implied bias. Santana objected because (1) Judge Gutierrez had already ruled on that motion; (2) S.O. was one of only two Hispanic persons on the jury; and (3) the third Hispanic panel member had already been peremptorily stricken by the state. Judge Weston granted the state's motion without reviewing S.O.'s prior voir dire testimony stating:

> I don't need additional testimony. I think the fact that you've got a juror whose husband at this moment is being prosecuted by the State, I think that's sufficient and I'm going to excuse her. I am satisfied that this is not an effort to try to put her off because she is Hispanic or has a Hispanic surname. I'm satisfied that the State's motion not only is based on a prejudice but it's [sic] a well-taken motion.

The court then seated the sworn alternate juror, selected two more alternates and reswore the jury panel.

At trial, Santana testified on his own behalf and said that he was at the scene of the shooting on the night in question, but that it was his passenger, Frederico Ponce, who shot Hernandez. Santana testified that he did not approach Coloca's car; Ponce ran away after he shot Hernandez; and he himself drove away in the van.

During trial, Santana sought to admit the coroner's report as a public record showing that Hernandez had methamphetamine and cocaine in his system at the time of the

shooting, but this evidence was excluded by the district judge who stated: "I find no [hearsay] exception that would allow it." During its closing, the state relied on Hernandez's dying declaration by arguing: "It was Santana who fired the shot . . . and we know that because of Mr. Hernandez's dying declaration." The state also pursued this point by offering the following line of argument to the jury:

> Ms. Cassidy (Santana's co-counsel) said in her closing argument that Santana didn't know Hernandez and Mr. Santana himself testified to that. If they didn't know each other, what did Hernandez do? Just make up a name? Now think about that. He said Santana shot me and he said it more than once. Santana, Santana. If they don't know each other, then why would he use the name Santana. What possible explanation is there? And think hard. There isn't one. There's no explanation.

The jury subsequently found Santana guilty of first degree murder and use of a deadly weapon. The district court sentenced Santana to an indeterminate life sentence for the first degree murder conviction, as required by I.C. § 18–4004, with twenty-five years fixed, enhanced by a ten-year indeterminate sentence for the use of a deadly weapon. Santana appeals.

## II.

## THE DISTRICT COURT ERRED BY STRIKING S.O. FOR IMPLIED BIAS, BUT SUCH ERROR WAS HARMLESS AND DID NOT SUBJECT SANTANA TO DOUBLE JEOPARDY

### A. Standard of Review

Where the construction and application of a statute presents pure questions of law, we exercise free review. *Boman v. State*, 129 Idaho 520, 525, 927 P.2d 910, 915 (Ct.App.1996). Furthermore, whether an appellant's prosecution complies with the constitutional protection against being placed in jeopardy twice is a question of law subject to free review. *State v. Hansen*, 127 Idaho 675, 678, 904 P.2d 945, 948 (Ct.App.1995).

### B. Removing S.O. For Implied Bias and Resulting Harm

Both parties passed S.O. for cause during the jury selection process after initial voir dire. The empanelled jury was sworn. It then came to the state's and Judge Gutierrez's attention that S.O. failed to disclose at voir dire that her husband was currently being prosecuted in Canyon County for a felony, punishable by life in prison, after the panel was specifically asked about such matters. The state, with no peremptory challenges left to exercise, moved that S.O. be removed from the sworn jury panel for implied bias. The judge denied the state's motion after reviewing I.C. § 19–2020 and finding none of the listed grounds to be applicable. Judge Gutierrez, however, allowed the parties to reopen voir dire to further question S.O. to facilitate analysis of any potential actual bias under I.C. § 19–2019(2).

After the parties were allowed to re-question S.O., Judge Gutierrez determined that no actual bias existed and S.O. could remain fair and impartial. This decision was within the sound discretion of the trial court. I.C. § 19–2019; *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). With Judge Weston then assigned to the case after Judge Gutierrez's recusal, the state revisited its motion to strike S.O. for implied bias—the functional equivalent of a motion to reconsider its previous motion. As stated previously, Judge Weston declined to open voir dire again or to review S. O.'s prior voir dire testimony; instead, he summarily found that S.O. should be excused because she was "a juror whose husband at this moment is being prosecuted by the State." Idaho Code § 19–2020 provides the legal grounds for finding implied bias, none of which encompass the instant situation. This code section further provides that a challenge for implied bias may be taken for the listed causes "and for no other." Idaho courts are, therefore, precluded from extending the permissible grounds for implied bias to encompass the instant situation and the trial court therefore committed legal error. *State v. Bowman*, 124 Idaho 936, 941, 866 P.2d 193, 198 (Ct. App.1993).

■ This error on the part of the trial court, however, was harmless because Santana's due process rights were not affected. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the United States Supreme Court said that "any claim that the jury was not impartial ... must focus not on [the juror who did not sit on the case], but on the jurors who ultimately sat." Where a defendant does not allege or cannot demonstrate that a member of his or her jury was biased or prejudiced, a due process challenge must fail. *State v. Finlayson*, 956 P.2d 283, 290–91 (Utah Ct.App.1998), *aff'd on other grounds*, 994 P.2d 1243 (Utah 2000). No harm can be shown where the jurors who eventually were seated are not even alleged to have been biased; Santana never alleged that the twelve jurors who sat on his case were anything but impartial. The United States Supreme Court recently reaffirmed this principle in *United States v. Martinez–Salazar*, 528 U.S. 304, ——, 120 S.Ct. 774, 782, 145 L.Ed.2d 792, 804 (2000), wherein the Court found that a lower court's decision to pass a juror for cause, who should have been stricken and was eventually peremptorily challenged by the defendant, did not violate a defendant's right to due process because the court's ruling did not "result in the seating of any juror who should have been dismissed for cause."

Furthermore, S.O. was only sworn and seated on the jury panel because she failed to adequately respond to the state's voir dire. The state, not knowing that S.O.'s husband was currently being charged with a felony punishable by life imprisonment, passed her for cause and she was subsequently sworn as part of the seated jury. However, this Court is without doubt that had S.O. properly answered the state's voir dire question concerning whether any members of her immediate family had ever been charged with a felony crime, the state would have exercised one of its peremptory challenges to remove her from consideration. Moreover, Judge Weston could have exercised his discretion in finding actual bias under I.C. § 19–2019(2) had the issue been properly raised.

Accordingly, even though Judge Weston erred by striking S.O. based on implied bias, this did not cause Santana to receive a biased jury. There was no harm to Santana.

## C. Double Jeopardy

■ It is a basic tenet of law that jeopardy attaches at the time the jury is sworn. *State v. Pugsley*, 128 Idaho 168, 173, 911 P.2d 761, 766 (Ct.App.1995); *State v. Nab*, 113 Idaho 168, 170, 742 P.2d 423, 425 (Ct.App. 1987). However, the United States Supreme Court has stated "that the protection of the Double Jeopardy Clause by its terms applies only if there has been some event ... which terminates the original jeopardy." *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242, 251 (1984). Therefore, while jeopardy does attach once the jury is sworn, "jeopardy does not terminate during the process of jury selection merely because sworn jurors are excused during the process of selecting alternates." *United States v. Trigg*, 988 F.2d 1008, 1010 (9th Cir.1993). "This event cannot terminate jeopardy any more than a failure of a jury to reach a verdict." *Id.* Where no constitutionally significant event occurs between the time the trial court swears the original jury panel and the empanelment of alternates, original jeopardy has not been terminated and thus, a criminal defendant has not been subjected to double jeopardy. *Id.*

The original jeopardy, which attached to Santana after the jury was first sworn, did not terminate when S.O. was removed, an alternate was seated, new alternates were selected and the new panel was re-sworn. None of these events was of sufficient constitutional significance to terminate the attached jeopardy; Santana was not subjected to double jeopardy.

## III.

## THE DISTRICT COURT ERRED BY EXCLUDING EVIDENCE OF THE PRESENCE OF COCAINE AND METHAMPHETAMINE IN HERNANDEZ'S SYSTEM AT THE TIME OF HIS DEATH, BUT SUCH ERROR WAS HARMLESS

## A. Standard of Review

■ Decisions concerning the relevancy of evidence are reviewed de novo, but

other questions concerning the admission of evidence are reviewed for an abuse of discretion. *State v. MacDonald*, 131 Idaho 367, 369, 956 P.2d 1314, 1316 (App.1998). If an error concerns evidence omitted at trial, the test for harmless error is whether there is a reasonable possibility that the lack of the excluded evidence might have contributed to the conviction. *State v. Harris*, 132 Idaho 843, 847, 979 P.2d 1201, 1205 (1999); *State v. Pressnall*, 119 Idaho 207, 209, 804 P.2d 936, 938 (Ct.App.1991).

## B. Discussion

██ Evidence admitted at trial showed that when Hernandez was asked what his name was, he responded, "Santana." He responded similarly when asked who shot him. The official coroner's record showed that Hernandez had cocaine and methamphetamine in his system at the time of his death. When the report was offered by Santana as a public record, the state's objections were that the report was irrelevant and that it was more prejudicial than probative. The trial court found that the document was relevant, but *sua sponte* determined that the document was hearsay and did not meet the requirements of any hearsay exception. The court refused to admit this evidence of the presence of drugs in Hernandez's system. This was error for two reasons.

### 1. Public records

"Unless the sources of information or other circumstances indicate lack of trustworthiness, records, reports . . . in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities" are not excluded as hearsay. I.R.E. 803(8). This includes "investigative reports by police and other law enforcement personnel" and "factual findings resulting from special investigation of a particular complaint, case, or incident" when offered by an accused in a criminal case. *Id.*

The instant coroner's report had the lab report attached, which set forth the State Department of Law Enforcement's regularly conducted and recorded activity—testing samples submitted by other law enforcement agencies. The lab report was a data compilation made by the state laboratory in Pocatello and is part of the lab staff's duties and regularly recorded activities. *State v. Nez*, 130 Idaho 950, 956, 950 P.2d 1289, 1295 (Ct. App.1997). The coroner's report, with the lab report attached, was an investigative report prepared by law enforcement personnel; presented factual findings resulting from special investigation of a case; and was offered by Santana in the criminal case against him. The district court recognized that "obviously it's a part of a coroner's record," but nevertheless found that there was "no [hearsay] exception . . . [that] would allow it" to be admissible, even after being referred to I.R.E. 803(8) by Santana's counsel. It was error to exclude the coroner's report in light of I.R.E. 803(8).

### 2. "Opening the door"

At trial, the state questioned the coroner about his investigation in the following manner:

Q: Did you take body fluids?

A: Yes, I did.

Q: What type?

A: Urine.

Q: And do you take possession of that?

A. Yes, I do.

Q: Do you maintain a chain of custody?

A: Yes, I do.

Q: Did you send it to somebody for testing?

A: I sent it to the State lab, forensic lab.

Q: Where would that be located?

A: Pocatello.

Q: Did you receive the sample back?

A: No.

Q: What did you request that the urine be screened for?

A: For alcohol and illegal drugs.

Q: And did Dr. Donnelinger make the actual determination of cause of death?

A: Yes, he did.

State's Attorney: Thank you. I have no further questions.

The state asked the coroner if he had Hernandez's urine screened and what it was

screened for, but specifically did not ask what the lab results indicated. Subsequently, when Santana sought to admit the result of the lab testing, which indicated that Hernandez had illegal drugs in his system at the time of his death, the state objected, claiming that the report was hearsay and irrelevant.

We conclude that the district court erred, in addition to the way described above, by not permitting the coroner's report to be entered into evidence after the state led the jury to the edge of revealing the lab's results. The net result may have induced the jury to impliedly conclude that Hernandez's urine was free from illegal drugs and alcohol because neither party discussed the results. To borrow a phrase from other realms of evidentiary procedure, the state "opened the door" and Santana should have been allowed to at least introduce the results of the state lab's testing to challenge the weight and credibility of Hernandez's dying declaration.

### C. Harmless Error

The issue to be addressed is whether there is a reasonable possibility that exclusion of the lab report, indicating that Hernandez had methamphetamine and cocaine in his system, might have contributed to the conviction of Santana. *Harris,* 132 Idaho at 847, 979 P.2d at 1205; *Pressnall,* 119 Idaho at 209, 804 P.2d at 938.

While we recognize that the state relied on Hernandez's dying declaration, identifying Santana as the shooter, we conclude that there was sufficient additional evidence supporting the conviction of Santana, such that the error described above was harmless. We further note that while the presence of illegal drugs in Hernandez's system was relevant, that fact could only have been used to meaningfully impeach his dying declaration that Santana shot him, if Santana could have shown at trial that Hernandez was under the influence of those drugs at the time the declaration was made. However, the state lab's test results were of no material use to Santana for this purpose because those results were not capable of determining the quantity of drugs in Hernandez's system or the date of Hernandez's consumption of the drugs. The report only demonstrated a de-

tectable presence of methamphetamine and cocaine, nothing more. Furthermore, at trial, two of the state's witnesses who witnessed Hernandez near the time of his dying declaration, testified that Hernandez did not appear to be intoxicated or high and there was nothing unusual about his manner on the night of the shooting.

The evidence presented at trial supports the conclusion that Hernandez was sober when he made his dying declaration. Therefore, it is not reasonably possible that the exclusion of evidence indicating that drugs were present in Hernandez's system at the time of his death contributed to Santana's conviction.

### IV.

### SANTANA WAS NOT DENIED A FAIR TRIAL BECAUSE OF THE CUMULATIVE EFFECT OF THE ABOVE HARMLESS ERRORS

An accumulation of irregularities, each of which in itself might be harmless, may in the aggregate show the absence of a fair trial. *State v. Campbell,* 104 Idaho 705, 662 P.2d 1149 (Ct.App.1983.) An appellate court must analyze the trial errors found to exist to determine if a defendant was denied a fair trial in contravention of his or her constitutional right to due process. *State v. Gray,* 129 Idaho 784, 804, 932 P.2d 907, 927 (Ct.App.1997).

We have identified more than one error occurring at Santana's trial and found each, standing alone, to be harmless. Based upon our analysis of the fundamentals of due process and application of those principles to the specific facts and circumstances of this case, we determine that those errors, individually harmless, did not, in the aggregate, deny Santana his constitutional right to a fair trial.

### V.

### SANTANA'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS DISMISSED WITHOUT PREJUDICE

### A. Standard of Review

To prevail on a claim of ineffective assistance of counsel, the appellant must

show that counsel's representation was deficient and that the deficiency was prejudicial. *State v. Roles*, 122 Idaho 138, 144, 832 P.2d 311, 317 (Ct.App.1992), *citing Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The appellant must show that the performance fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988). There is a strong presumption that the performance by counsel was within the "wide range of professional assistance." *Id.* To show prejudice, the appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Roles*, 122 Idaho at 145, 832 P.2d at 318.

■ Initially, we note that this ineffective assistance of counsel claim is raised directly on appeal and not in a U.P.C.P.A. application.

Typically, ineffective assistance of counsel claims challenge the information communicated—or not communicated—between the defendant and his trial counsel, as well as other aspects of the attorney's performance, theories and strategies prior to and during trial. Usually, the trial record does not encompass the facts surrounding such matters so as to allow adequate review of trial counsel's performance based solely on the trial record. For this reason we have previously noted that ineffective assistance is an issue rarely appropriate to a direct appeal from a judgment of conviction; rather it is usually reserved to post-conviction relief proceedings, where a more complete evidentiary record can be developed.

*State v. Allen*, 123 Idaho 880, 882, 853 P.2d 625, 627 (Ct.App.1993). If we were to rule on Santana's ineffective assistance claim, that decision would become *res judicata* and would preclude him from raising these issues in a subsequent U.P.C.P.A. application, which could potentially provide a far better evidentiary record to support his position.[2] *State v. Saxton*, 133 Idaho 546, 549, 989 P.2d 288, 291 (Ct.App.1999). Therefore, it appears that

appellate counsel may often do their clients a disservice by attempting to present ineffective assistance claims in a direct appeal from the criminal judgment, where the issues cannot be adequately supported by the existing record. *Id.* at 550, 989 P.2d 288.

We conclude that this appeal is not the proper vehicle to adjudicate Santana's claim of ineffective assistance of counsel, based upon the record before us. Accordingly, we decline to reach the issues raised by Santana and thereby risk *res judicata* effect under the U.P.C.P.A.

### VI.

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN SENTENCING SANTANA

■ Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *State v. Hedger*, 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989). A sentence may constitute a clear abuse of discretion if it is unreasonable upon the facts of the case. *State v. Broadhead*, 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992).

[A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria.

---

**2.** Notably, after filing his appeal, Santana filed a motion to augment the record with an affidavit from his trial counsel. The state objected and

the motion was denied by the Idaho Supreme Court. This affidavit would likely be admissible in a U.P.C.P.A. proceeding.

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405, quoting *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982).

Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). With respect to sentences imposed under the Uniform Sentencing Act,

> the minimum period [of confinement] generally will be treated as the probable measure of confinement for the purpose of sentence review. By focusing on this period, we do not wholly disregard the aggregate length of the sentence, nor do we suggest that a prisoner will be *entitled* to parole when the minimum period has elapsed; but we do recognize that he will be *eligible* for parole at that time.

*State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989).

Under I.C. § 18–4004, the maximum penalty for first degree murder is death. Santana's minimum period of confinement is twenty-five years. Accordingly, Santana must demonstrate that this twenty-five year period was an abuse of the district court's discretion.

As stated above, Santana senselessly killed Hernandez by shooting him in his abdomen with a rifle and then fled the area. Since this incident, Santana has maintained his innocence and has shown no remorse for his crime. At the sentencing hearing, the court reviewed the goals of sentencing and found that Santana's "utter disregard for human life" could not be tolerated and that a lengthy term of confinement was necessary.

Based upon our review of the complete record in this case, we are unable to say that the district court abused its discretion in sentencing Santana to a unified term of life imprisonment, with twenty-five years fixed, for his conviction of first degree murder and use of a deadly weapon.

## VII.

## CONCLUSION

The district court's errors in striking juror S.O. for implied bias and excluding a public record demonstrating the presence of illegal drugs in Hernandez's system at the time of his dying declaration were harmless. Santana was not subjected to double jeopardy and the cumulative effect of the above errors was also harmless. Santana's conviction and sentence are affirmed. Santana's ineffective assistance of counsel claim is dismissed without prejudice.

Judge LANSING and Judge Pro Tem McLAUGHLIN concur.