# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 33843

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) Boise, April 2011 Term |
| Plaintiff-Respondent, | ) |
| | ) 2011 Opinion No. 68 |
| v. | ) |
| | ) Filed: May 27, 2011 |
| JONATHAN W. ELLINGTON, | ) |
| | ) Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) |
| _____ | ) |

Appeal from the District Court of the First Judicial District of the
State of Idaho, Kootenai County. Hon. John P. Luster, District Judge.

The decision of the district court denying the motion for new trial
is <u>reversed</u>. The conviction and sentence are <u>vacated</u> and the case
is <u>remanded</u> to the district court for a new trial.

Molly J. Huskey, State Appellate Public Defender, Boise, for appellant.
Erik R. Lehtinen argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.
Mark W. Olson argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Jonathan Ellington appeals from his convictions for one count of second-degree murder and two counts of aggravated battery. He argues on appeal that prosecutorial misconduct, evidentiary errors, a biased jury, and the cumulative-error doctrine entitle him to a new trial. We find merit in several of Mr. Ellington's assignments of error at trial, but we grant a new trial to Mr. Ellington on the basis that the district court abused its discretion in denying Mr. Ellington's motion for new trial brought after evidence came to light that the State's sole rebuttal witness, Fred Rice, an Idaho State Police officer, provided false testimony at trial that went to the defense's sole theory of the case.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

At about 11:00 a.m. on January 1, 2006, Mr. Ellington left his friend Ron Cunningham's house in Athol, Idaho, to go back home. While driving, he came upon a white Honda Accord, driven by Jovon Larsen, age 22, with her sister Joleen, 18, in the passenger seat. Mr. Ellington claims the girls were playing "cat and mouse" with him, attempting to cut him off, and that they flipped him off. Joleen claims that they were not cutting Mr. Ellington off, and Jovon maintains that they did not flip off Mr. Ellington. Mr. Ellington passed the Honda in his Chevy Blazer, and at the next stop sign, got out of his car, approached the Honda that was now stopped behind him, and yelled and cursed at the girls and hit the driver's side window.[1]

The girls called 911 and began following Mr. Ellington because there were no license plates on his vehicle and they wanted the police to be able to track him. After a short while, Mr. Ellington made a U-turn on the road and faced the girls, driving into their lane and then swerving back into the correct lane, passing them going the other way. Joleen testified that as Mr. Ellington went by them he flipped them off and mouthed an expletive at them. The girls turned around to continue to follow Mr. Ellington but were unable to catch up with him, and he went back home.

The girls decided to stop and wait for an officer from the sheriff's department to arrive, as they were instructed to do by the 911 operator, and then called their parents, Joel and Vonette Larsen, who arrived about fifteen minutes later. The deputy sheriff arrived and then left again to investigate, and Mr. and Mrs. Larsen went the other way to look for Mr. Ellington in their Subaru. While driving along the road, Mr. and Mrs. Larsen saw the Blazer drive out of an adjacent driveway and back onto the road, and they began to follow it. As the Blazer and the Subaru turned the corner that Joleen and Jovon were waiting at, the girls pulled the Honda out behind the Blazer but in front of their parents in the Subaru.[2] At the same time, Joleen placed another call to 911. The girls were going about ninety miles per hour and Mr. Ellington was probably going about a hundred miles per hour. Mr. Ellington turned onto Scarcello Road, going westbound, and both the girls in the Honda and Mr. and Mrs. Larsen in the Subaru continued to

---

[1] Since Mr. Ellington did not testify at trial, most of the factual background in the record on appeal was provided by the State's witnesses. Particularly, the only description of the altercation and ensuing chase was the trial testimony of Mr. Larsen, Jovon and Joleen. We understand by the argument made by Mr. Ellington in his briefing to this Court that the facts regarding how the incident began and progressed are contested by Mr. Ellington.

[2] Joleen also claims that Mr. Ellington again flipped them off when he drove by.

2

chase him. Although the 911 dispatcher told the girls to be careful, that Mr. Ellington was likely driving fast because he was scared, and to stop following the Blazer once they told her they were going ninety miles an hour, the girls did not stop.[3]

Mr. Ellington made a left turn into a driveway on the south side of Scarcello Road, apparently intending to reverse his direction, where he skidded onto a snowbank. The Subaru then passed the Honda, coming into the (incorrect) eastbound lane of traffic. Mr. Larsen has testified inconsistently as to whether he was attempting to block the Blazer in, or whether he was attempting to block the Blazer from hitting the Honda. On direct examination, Mr. Larsen testified: "I told the wife, I go get around the girls and block him from hitting the girls, because he's already threatened the girls, he ran them off the road, I wanted to protect my girls." In contrast, Deputy William Klinkefus testified that when he interviewed Mr. Larsen upon arriving at the scene, Mr. Larsen told him that he "was able to park his vehicle behind the Jimmy in an attempt to block him in so that they could wait for law enforcement to get there."[4]

Mr. Ellington reversed back out of the snowbank and was now pointed back east. As Mr. Ellington was attempting to drive away eastbound down Scarcello Road, the Blazer made contact with the front of the Larsens' Subaru which was still slowly moving toward the Blazer, seemingly blocking most of the eastbound lane. Acceleration marks suggest that Mr. Ellington was attempting to swerve around the Subaru. The expert testimony at trial also tended to show that the impact with the Subaru caused the Blazer to rotate somewhat in a counterclockwise direction, so that the Blazer was pointing across the road toward where the Honda was in the westbound lane, instead of pointing toward its initial path eastbound.[5] After making contact with the Subaru, the Blazer continued past the Subaru and impacted the front left corner of the Honda which was located mostly in the opposite, westbound lane.[6]

---

[3] After the 911 operator told Joleen that the police officer "wants you to pull over and not—not follow him at that speed, okay?" Joleen responded, "Well we want to keep our—we can slow down. That's not a problem. We just want to see where he turns when he gets on 41."

[4] Mr. Larsen explained this discrepancy in his statements at trial as a result of him not being properly able to articulate what he meant, which was that he was attempting to "block" Mr. Ellington from hitting his daughters' car.

[5] Mr. Larsen testified that after the Blazer impacted the Subaru, Mr. Ellington "could have left, he could have went straight and left" but that instead he turned around the Subaru and accelerated toward the Honda.

[6] While Jovon maintained during her testimony at trial that they were completely in the westbound lane, even the State's accident reconstructionist testified that the scuff marks over the centerline of the road indicated that the front of the Honda extended at least twelve to seventeen inches over the center line.

After the impact, the Blazer rode up onto the Honda, and the Blazer pushed the Honda across the road and into the shoulder on the opposite side. Mr. Larsen then grabbed his .44 Magnum revolver from under his seat in the Subaru and got out of the passenger side of the car to run toward the Blazer, right around the time it was backing up and disengaging from the Honda. At the same time, Mrs. Larsen got out of the Subaru and ran toward the Honda. Mr. Larsen approached the passenger side of the Blazer around the same time that Mr. Ellington put the Blazer into drive. Mr. Larsen initially leveled his gun at Mr. Ellington from right outside the Blazer's passenger window, and then because he did not want to hit his daughters, fired a shot that traveled through the front-quarter passenger-side panel of the Blazer, allegedly attempting to hit the motor.

Mrs. Larsen was running across the road in front of Mr. Ellington, attempting to get to her daughters, and as Mr. Ellington punched the gas, she put her hands up and started to move back toward the middle of the road. Mrs. Larsen was struck by Mr. Ellington, which caused her body to come down on the hood of the Blazer before falling to the road. Once she fell to the road, the tires of the Blazer ran over her head and torso, causing catastrophic injuries that resulted in her death. Mr. Ellington left the scene and went back to the Cunningham residence, where he had been earlier in the day, and was eventually arrested there after police officers spotted his car.

Mr. Ellington was charged with two counts of aggravated battery for hitting the Honda, and one count of second-degree murder for Mrs. Larsen's death. At Mr. Ellington's first preliminary hearing, the magistrate found that there was not sufficient evidence to bind Mr. Ellington over for second-degree murder or for the aggravated batteries at issue here. The State then dismissed the original charges and refiled them under a new case. At the second preliminary hearing before a different magistrate Mr. Ellington was bound over on all charges. On March 23, 2006, Mr. Ellington filed a motion to dismiss arguing that the evidence adduced at the second preliminary hearing was not sufficient to hold him for trial. The court denied the motion, finding no abuse of discretion by the magistrate, while noting at least in the case of the aggravated battery counts,

> a serious question is present in this case as to whether Mr. Ellington was trying to escape a volatile situation or whether he intentionally brought harm to the girls or acted willfully in crashing into their car. In this court's opinion that is a question for a jury to resolve.

4

Jury selection occurred on Tuesday August 22, 2006, and the next day the State began to present its case-in-chief, which lasted seven days, from Wednesday, August 23, until Thursday, August 31. After the State rested, the defense moved for an acquittal on all charges under I.C.R. 29. Although the motion was denied, the district court granted it as to the "express malice" theory of second-degree murder, finding that a reasonable juror could not find, based on the evidence presented, that Mr. Ellington intentionally and deliberately took Mrs. Larsen's life away. However, the court allowed the case to go to the jury on the theory that Mr. Ellington acted with "implied malice."

The defense presented its case-in-chief over the course of three days, and the State then presented its single rebuttal witness, Corporal Fred Rice, to rebut the testimony of the defense's accident reconstruction expert, Dr. William Skelton. The jury deliberated for about a day and a half before returning their verdict that Mr. Ellington was guilty of two counts of aggravated battery and one count of second-degree murder. Mr. Ellington was sentenced to twenty-five years with twelve years fixed for the second-degree murder conviction, and fifteen years with seven years fixed for each aggravated battery charge, to be served concurrently. The Judgment and Sentence was filed on December 14, 2006, and Mr. Ellington timely filed a notice of appeal on January 4, 2007.

### III. ISSUES ON APPEAL

1. Did the State act improperly in four alleged acts of prosecutorial misconduct, including a comment on Mr. Ellington's post-arrest silence and the use of inflammatory language in questioning witnesses?

2. Did the district court make evidentiary errors in failing to strike the word "homicide" from an exhibit, admitting the opinion testimony of Trooper Daly, and allowing the pathologist to testify?

3. Were Mr. Ellington's due-process rights violated when three prospective jurors that were not impaneled expressed their opinions of Mr. Ellington's guilt during voir dire?

4. Were the errors at trial harmless, and did the accumulation of errors in the trial deprive Mr. Ellington of a fair trial?

5. Did the district court abuse its discretion in denying Mr. Ellington's motion for new trial based on newly-discovered evidence that the State's sole rebuttal witness testified inconsistently in a previous trial and may have perjured himself in Mr. Ellington's trial?

### IV. ANALYSIS

**A.    Prosecutorial Misconduct**

5

Mr. Ellington assigns four distinct instances of prosecutorial misconduct: an improper comment on his post-arrest silence, questions to two witnesses designed to inflame the jury, and fraud upon the court in the offer of the testimony of the pathologist.

1.      *Standard of Review*

Where a defendant alleges error at trial that he had contemporaneously objected to, this Court reviews the error on appeal under the harmless error test. *State v. Perry*, 150 P.3d 209, 227, 245 P.3d 961, 979 (2010). When the alleged error is prosecutorial misconduct, first the defendant must demonstrate that prosecutorial misconduct occurred, and then the Court must declare a belief beyond a reasonable doubt that the misconduct did not contribute to the jury's verdict, in order to find that the error was harmless and not reversible. *Id.* at 227–28, 245 P.2d 979–80.

2.      *The State Improperly Commented on Mr. Ellington's Post-Arrest Silence*

Mr. Ellington argues that the prosecutor acted improperly in allegedly commenting on Mr. Ellington's post-arrest silence through the questioning of a detective witness during the State's case-in-chief. On direct examination of the State's witness Sergeant Brad Maskell of the Kootenai County Sherriff's Department, when asking about Sergeant Maskell's arrival at the location on Scarcello Road where Mr. Ellington was apprehended after the incident, the prosecutor proceeded with the following line of questioning:

> Q. At the time that you got there and he was in the back of that patrol car, was he under arrest?
> A. Yes.
> Q. And so you did not interview him?
> A. I attempted to.

Mr. Ellington alleges that this was an improper comment on Mr. Ellington's post-arrest silence. The State argues that the prosecutor specifically asked the question, "And so you did not interview him" in a leading way, to avoid any comment on silence and therefore there was no improper comment by the prosecutor himself. In denying Mr. Ellington's motion for mistrial that was made immediately following this line of questioning, the district court found that "[i]n this particular case I don't think there is a sufficient showing to satisfy the court that it was the government's manifest intention to do that which has occurred here in terms of any inference that could be drawn," and as a result there was no misconduct.

The Fifth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, section 13 of the Idaho Constitution, guarantee a criminal defendant the right not to be compelled

to testify against himself. U.S. Const. amends. V, XIV; Idaho Const. art I, § 13. The U.S. Supreme Court has interpreted this right also to bar the prosecution from commenting on a defendant's invocation of that right. *Griffin v. California*, 380 U.S. 609, 613–14, 85 S. Ct. 1229, 1232–33 (1965). In the case of post-arrest silence, the U.S. Supreme Court has provided guidance as to when and how that silence can and cannot be used by the State at trial. First, because of the promise present in a *Miranda* warning,[7] a prosecutor may not use evidence of post-arrest, post-*Miranda* silence for either impeachment, *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 2245 (1976), or as substantive evidence of guilt in the State's case-in-chief, *Wainwright v. Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 639 (1986). A prosecutor may use evidence of pre-*Miranda* silence, either pre- or post-arrest, for impeachment of the defendant. *Brecht v. Abrahamson*, 507 U.S. 619, 628–29, 113 S. Ct. 1710, 1716–17 (1993) (pre-arrest, pre-*Miranda* silence may be used for impeachment); *Weir v. Fletcher*, 455 U.S. 603, 607, 102 S. Ct. 1309, 1312 (1982) (post-arrest, pre-*Miranda* silence may be used for impeachment). The U.S. Supreme Court has not spoken as to whether post-arrest, pre-*Miranda* silence may be used as evidence of substantive guilt, and the federal Circuits are currently split on the issue.[8] However, this Court has held that a defendant's right to remain silent attaches upon custody, not arrest or interrogation, and thus a prosecutor may not use any post-custody silence to infer guilt in its

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1996) established that statements made by a defendant in response to interrogation while in police custody cannot be admitted at trial unless the defendant was informed of the right to consult with an attorney and the right to remain silent, and that the defendant not only understood these rights but voluntarily waived them.

[8] The Seventh, Ninth and D.C. Circuits hold that substantive commentary on a defendant's post-arrest, pre-*Miranda* silence violates a defendant's Fifth Amendment rights. *United States v. Velarde-Gomez*, 269 F.3d 1023, 1029 (9th Cir. 2001) (en banc) ("post-arrest, pre-*Miranda* silence cannot be admitted into evidence in the government's case in chief); *United States v. Moore*, 104 F.3d 377, 386 (D.C. Cir. 1997) ("It simply cannot be the case that a citizen's protection against self-incrimination only attaches when officers recite a certain litany of his rights."); *United States v. Hernandez*, 948 F.2d 316, 322–23 (7th Cir. 1991) (silence pre-*Miranda* cannot be used in the government's case in chief). The Second Circuit has assumed, without expressly deciding, that the use of pre-*Miranda* silence is impermissible. *United States v. Caro,* 637 F.2d 869, 876 (2d Cir.1981) (holding without discussion that pre-*Miranda* silence could not be used in the State's case-in-chief but finding the error harmless). The First and Sixth Circuits have gone even further and held that using pre-arrest silence can violate the defendant's Fifth Amendment rights. *Combs v. Coyle,* 205 F.3d 269, 280–83 (6th Cir. 2000); *Coppola v. Powell,* 878 F.2d 1562, 1567–68 (1st Cir. 1989). The Fourth, Eighth, and Eleventh Circuits have held that it does not violate a defendant's Fourth Amendment rights to use post-arrest, pre-*Miranda* silence. *United States v. Frazier,* 408 F.3d 1102, 1109–11 (8th Cir. 2005) (admission of testimony on defendant's pre-*Miranda* silence is not error); *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) (same); *United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985) (same). The Fifth Circuit has not yet ruled on the issue. *United States v. Salinas,* 480 F.3d 750, 759 (5th Cir. 2007) (addressing post-arrest, pre-*Miranda* silence issue, and stating, "[b]ecause this circuit's law remains unsettled and the other federal circuits have reached divergent conclusions on this issue, even assuming that the prosecutor's comments were improper, [the defendant] cannot satisfy the second prong of the plain error test-that the error be clear under existing law").

7

case-in-chief. *State v. Moore*, 131 Idaho 814, 820–21, 965 P.2d 174, 180–81 (1997). From the record, it is unclear whether Mr. Ellington was Mirandized at the time Sergeant Maskell "attempted to" interview him. However, from Sergeant Maskell's testimony, he was certainly in custody and under arrest at that time, and thus under this Court's holding in *Moore*, his right to silence was protected.

This Court also held in *Moore* that "[t]he constitutional right against self-incrimination is not absolute . . . and applies only when the silence is used solely for the purpose of implying guilt." *Moore*, 131 Idaho at 821, 965 P.2d at 181; *see also State v. Stefani*, 142 Idaho 698, 701, 132 P.3d 455, 458 (Ct. App. 2005) ("A defendant's decision to exercise his or her right to remain silent, whether before or after arrest and *Miranda* warnings, cannot be used for the purpose of inferring guilt."); *State v. Molen*, 148 Idaho 950, 959, 231 P.3d 1047, 1056 (Ct. App. 2010) ("A defendant's exercise of his right to remain silent concerning an alleged offense may not be used by the State at trial in order to raise an inference of guilt."); *accord Greer v. Miller*, 483 U.S. 756, 764–65, 107 S. Ct. 3102, 3108 (1987) ("The fact of Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case."). Because defense counsel moved for a mistrial immediately after Sergeant Maskell's answer here, it is unclear what the prosecutor's line of questioning regarding the fact that Mr. Ellington was not interviewed at that time was being used to establish. However, the jury was likely to infer that the reason Sergeant Maskell only "attempted" to interview Mr. Ellington rather than actually interviewing him was because he chose to invoke his right to remain silent once he was put under arrest.

The prosecutor represented to the district court that he phrased the question to Sergeant Maskell in a leading way in order to avoid a comment on Mr. Ellington's silence. However, the State cannot provide any reason why it was at all relevant to ask the question to Sergeant Maskell to begin with, whether it was crafted in a leading way or not. The fact that Mr. Ellington was not interviewed by the police was simply unnecessary testimony, and the only conclusion this Court can come to is that the prosecutor or Sergeant Maskell was attempting to, and did, draw attention to Mr. Ellington's post-arrest silence. Further, the State's argument that it was Sergeant Maskell that commented on Mr. Ellington's silence, and therefore the prosecutor was not responsible for what Sergeant Maskell said, is unavailing. Sergeant Maskell is an officer with the Kootenai County Sherriff's Department, and therefore a representative of the State. To

8

hold that a prosecutor may elicit prejudicial answers or comments on a defendant's silence from State officers acting as witnesses by later claiming that the officer and not the prosecutor himself supplied the prejudicial answer, would undermine the purpose of the rules barring misconduct during trial by superficially allowing the prosecutor to shift the blame to the State's own representative. As a representative of the State, Sergeant Maskell had the same duty as the prosecutor not to improperly comment on Mr. Ellington's silence. Even more, when an officer of the State gives any unsolicited testimony that is gratuitous and prejudicial to the defendant, that testimony will be imputed to the State for the purposes of determining prosecutorial misconduct. Sergeant Maskell's comment on Mr. Ellington's silence may not have been specifically solicited by the prosecutor, but it was undoubtedly both gratuitous and prejudicial to Mr. Ellington. Further, there was absolutely no reason for the prosecutor to engage in this line of questioning in the first place, particularly given that he clearly knew the line of questioning would create a high risk of an improper comment on Mr. Ellington's silence. Therefore, we hold that there was misconduct.

3. *The Prosecutor Engaged in Misconduct by Inflaming the Jury in (1) Eliciting an Unnecessary and Prejudicial Response from a Witness Regarding the Disturbing Nature of the Crime and (2) Repeatedly Using Versions of the Phrase "ran over your wife" in Questioning Mr. Larsen*

Mr. Ellington alleges that the prosecutor engaged in misconduct by (1) eliciting a response from a witness that he had only worked at his job for two months because the crime had disturbed him so much and (2) repeatedly stating that Mr. Ellington "ran over" Mr. Larsen's wife while questioning Mr. Larsen, because this conduct was calculated to inflame the passions and prejudices of the jury. "While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair." *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007) (quoting *State v. Estes*, 111 Idaho 423, 427–28, 725 P.2d 128, 132–33 (1986)). However, in reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.*

In questioning Eric Hartmann, the forensic audio analyst who enhanced the 911 audio recording of the incident, the prosecutor asked: "Can you tell us, please, why you only worked at

9

RMIN for two months?"[9] Mr. Hartmann answered: "The simple answer is this case in particular left me with the inability to sleep and I decided that—" The defense objected to the answer, and the objection was sustained and the response stricken. Mr. Hartmann then stated, without being asked a question: "So I had some trouble with this case." The prosecution next asked: "After you worked on this particular recording you decided not to work for RMIN anymore?" to which Mr. Hartmann answered, "That's correct." The defense objected on the ground of relevance, was overruled, and after cross-examining Mr. Hartmann, moved for a mistrial based on prosecutorial misconduct in asking and answering the question regarding why Mr. Hartmann had only worked at RMIN for such a short time. On appeal, Mr. Ellington argues that "there was absolutely no proper purpose for [the prosecutor] to have posed the question that he did," and that this "smacked of an improper attempt to once again influence the jury with an emotional appeal." The State argues that the question and answer were relevant and thus proper in order to explain that Mr. Hartmann's short time working on the case was "not because of poor performance or for a reason related to his ability to do his job well." It also argues that even if the question and answer was prejudicial, it "was not so inflammatory as to cause the jury to determine guilt on factors outside the evidence," because the "gruesome and tragic nature of what happened was well documented and clearly before the jury in various forms of evidence and testimony."

"[A]ppeals to emotion, passion or prejudice of the jury through use of inflammatory tactics are impermissible." *State v. Phillips*, 144 Idaho 82, 87, 156 P.3d 583, 588 (Ct. App. 2007); *see also State v. Babb*, 125 Idaho 934, 942, 877 P.2d 905, 913 (1994) (holding that the un-objected to statements made by the prosecutor did not "indicate an intent on the part of the prosecuting attorney to inflame the minds of the jurors or to arouse passion or prejudice against [the defendant], nor were they so inflammatory that the jurors might be influenced to determine guilt on factors outside the evidence," and thus there was no misconduct). In *Field*, this Court found that the prosecutor's question to a witness about a previous investigation was improper because "[c]learly the testimony the State was attempting to elicit from [the witness] was highly prejudicial and irrelevant in this case." *Field*, 144 Idaho at 572, 165 P.3d at 286

We find that the testimony the prosecutor was attempting to elicit from Mr. Hartmann was similarly highly prejudicial and irrelevant. While the prosecution here claims that the

---

[9] RMIN is the Rocky Mountain Information Network, a government funded company that contracts with law enforcement for various media related services.

question was relevant to rebut anticipated impeachment or attacks on Mr. Hartmann's character by the defense by attempting to establish that Mr. Hartmann was not fired for poor performance, a witness's credibility and character may not be supported before it has been attacked. I.R.E. 608(a), (b); *Pierson v. Brooks*, 115 Idaho 529, 532–34, 768 P.2d 792, 795–97 (Ct. App. 1989) (holding that testimony supporting the witness's character for truthfulness was improperly admitted on re-direct examination because there was no attack on the witness's credibility or character during cross-examination). Even more, the length of Mr. Hartmann's employment was only before the jury because the prosecutor had intentionally elicited that testimony from him. As with its comment on Mr. Ellington's silence, the prosecution never should have gone down the road of questioning Mr. Hartmann about his length of employment knowing full well that it ended with another prejudicial reflection on the disturbing nature of the incident. The testimony regarding why Mr. Hartmann had only worked at RMIN for two months was irrelevant at this point in the testimony. The district court sustained the objection to this answer, implicitly acknowledging the low or non-existent probative value and highly prejudicial nature of the answer. Thus, as the district court noted, the testimony "was unnecessarily elicited here from the witness." Thus, we find that there was prosecutorial misconduct.

Mr. Ellington's next assignment of misconduct concerns the questioning of Mr. Larsen. During this questioning, the prosecutor asked four questions in a row that included a version of the phrase "ran over your wife" in order to apparently establish whether Mr. Ellington was in the wrong lane of travel when Mrs. Larsen was hit. These included the colorful phrases "After he got done running over your wife," "How long after—he ran over your wife," "After he got done running over your wife," and "How long—after he got done running over her," all asked one after the other. After defense counsel objected and the prosecutor was told by the court to "move on," the prosecutor immediately asked again what Mr. Larsen did "after Mr. Ellington ran over your wife." Mr. Ellington argues that the prosecutor's "intentional, gratuitous references to Mr. Larsen's wife having been run over were calculated to, and did, appeal to the emotions of the jurors, and as such, constituted misconduct." We agree.

The State argues that "[t]he fact that Ellington ran over Mr. Larsen's wife was an undisputed fact of this case," and that therefore "the focus of the repeated statements was not on the fact that Mr. Ellington ran over Mr. Larsen's wife, but that he ran her over in the wrong lane—indicating that he *intentionally* ran her over." It may be true that the prosecutor was

11

attempting to establish whether Mr. Ellington was in the wrong lane or not. However, the prosecutor could have very easily made the same points and elicited the exact same testimony from Mr. Larsen by phrasing the questions in a less inflammatory way. Repeatedly reiterating the image of Mr. Ellington "running over" Mr. Larsen's "wife" was wholly unnecessary. While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935). We are also troubled that the prosecutor seems to have completely ignored the court's admonition to "move on," by immediately asking another inflammatory question. The court should not have to lecture the prosecutor in front of the jury in order to get its point across that the current line of questioning is inappropriate and the prosecutor should move to a different one. Thus, we find that the prosecutor's repeated use of the phrase "ran over your wife" was also misconduct.

> 4.      *The Offer of Proof for Dr. Ross' Testimony Was Not a Fraud But Was Unnecessarily Misleading*

Mr. Ellington alleges misconduct by the prosecution in offering the testimony of the pathologist, Dr. Ross, regarding the injuries suffered by Mrs. Larsen. Mr. Ellington argues that the prosecution claimed in its offer of proof that Dr. Ross would be testifying about where Mrs. Larsen was in the roadway when she was struck and the speed of Mr. Ellington's Blazer but instead the testimony focused only on the gruesome nature of the injuries in order to inflame the passions and prejudices of the jury, and thus the prosecutor committed a fraud upon the court. The State argues that the testimony was consistent with the offer of proof and that its purpose was not to inflame the jury but rather to show how the injuries were inflicted in order to help the jury determine whether Mr. Ellington acted intentionally. The record reveals that part of the State's offer of proof for Dr. Ross included distinguishing injuries that were the result of being struck and those that were the result of being run over, which was relevant to the issue of what direction Mrs. Larsen may have been facing or where she was located on the roadway. This in turn was probative as to whether Mr. Ellington acted intentionally or not, because if she was not in the lane of traffic Mr. Ellington was attempting to leave from, it would be more likely that he had intentionally come after her by crossing into the wrong lane of traffic.

Dr. Ross described Mrs. Larsen's injuries in great detail, and then testified that the injuries to her chest were more consistent with being struck by a motor vehicle than dragged by one and that the injuries to her head were consistent with being run over by a tire. This allegedly went to the issue of which way she may have been facing, and may have provided potential

information as to where she was placed in the roadway. However, Dr. Ross did not actually testify to where Mrs. Larsen was standing and what direction she was facing. The vast majority of the testimony was focused on cataloguing and describing in detail each of Mrs. Larsen's injuries. We will not go so far as to hold that the prosecutor committed a fraud upon the court as Mr. Ellington suggests, however, the offer was at the least misleading as to the majority of the focus of Dr. Ross' testimony, and highlights yet another attempt by the prosecutor to influence the jury's passions and prejudices.

**B.     Admissibility of Evidence**

Mr. Ellington argues that there was reversible error when the district court failed to strike the word "homicide" from an exhibit, admitted the opinion testimony of Trooper Daly, and allowed the pathologist Dr. Ross to testify.

1.      *Standard of Review*

The question of whether evidence is relevant is a matter of law subject to free review. *State v. Shackleford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010). The district court's determination of whether the probative value of the evidence outweighs its prejudicial effect is reviewed for an abuse of discretion. *Id.* The decision to admit expert opinion testimony is also reviewed for an abuse of discretion. *State v. Merwin*, 131 Idaho 642, 645, 962 P.2d 1026, 1029 (1998). If the Court finds that the district court erred by abusing its discretion in admitting the evidence over an objection by the defense, it then must determine whether that error is harmless beyond a reasonable doubt. *Perry*, 150 Idaho at 227, 245 P.3d at 979; *State v. Jones*, 125 Idaho 477, 498, 873 P.2d 122, 143 (1994).

2.      *The Failure to Strike the Word "Homicide" from a Diagram Depicting the Scene Was an Abuse of Discretion*

Mr. Ellington argues that the district court abused its discretion in refusing to strike the word "homicide" from Exhibit 46, a large diagram that was used by Trooper Charles Robnett in laying out the scene of the accident, because the prejudicial effect of that word substantially outweighed any probative value it had. Defense counsel did not object to the exhibit's admission when it was initially offered. Mr. Ellington claims that "homicide" is synonymous with "murder" in the jurors' minds and therefore its probative value was very low, or nonexistent, and its prejudicial value was very high. The State argues that the district court properly ruled that because "homicide" was a legally accurate representation of the scene, the district court did not abuse its discretion in failing to strike the word.

Normally, a party waives an objection to the admission of evidence by failing to object at the time of its admission. *State v. Stevens*, 126 Idaho 822, 824, 892 P.2d 889, 891 (1995). However, when a party brings a motion to strike a portion of that evidence before the evidence is "published to the jury, before the close of arguments, and before the case has been submitted to the jury," the claim that the trial court erred by refusing to strike prejudicial evidence is properly preserved for appeal. *State v. Thompson*, 132 Idaho 628, 634, 977 P.2d 890, 896 (1999) (citing *Hayward v. Yost*, 72 Idaho 415, 424, 242 P.2d 971, 976 (1952) ("[O]rdinarily an objection comes too late for the purpose of review on appeal, if made for the first time after the jury has retired or the cause has been submitted to them, or after the close of the arguments, or on motion for new trial or otherwise, after the verdict has been rendered.")). While the exhibit was admitted by the court and Trooper Robnett testified from it, there is no indication from the transcript that it was published to the jury before the defense brought its motion to strike. The motion was certainly well before any closing arguments or submission of the case to the jury. Therefore, Mr. Ellington properly preserved his claim on this issue for appeal.

Black's Law Dictionary defines "homicide" as "[t]he killing of one person by another." Black's Law Dictionary 802 (9th ed. 2009). It goes on to explain that "[t]he legal term for killing a man, whether lawfully or unlawfully, is 'homicide.' There is no *crime* of 'homicide.' Unlawful homicide at common law comprises the two crimes of murder and manslaughter." *Id.* (quoting Glanville Williams, Textbook of Criminal Law 204 (1978)) (emphasis in original). It is true that the diagram contained no mention of "murder" or "crime" and that the trial judge had expressly forbidden the State from making references to the "murder scene" earlier in the trial. However, there was very little if any probative value to the word's continued inclusion in the exhibit, even if it was technically legally accurate. Also, even though "homicide" was an accurate representation of the diagram, it still contained the risk that an average juror would equate it with "murder" and thus carried a substantial amount of prejudice. *See* Barron's Law Dictionary 221 (3d ed. 1991) (stating that the term "homicide" is "most commonly used to refer to an unlawful killing of a human being by any other human being."); The Merriam-Webster Online Thesaurus, http://www.merriam-webster.com/thesaurus/homicide (last visited May 23, 2011) (defining "homicide" as "the intentional and unlawful taking of another person's life" and listing "foul play," "murder," and "slaying" as synonyms).

14

This Court must evaluate whether the district judge "perceived the issue as one of discretion, acted within the bounds of that discretion and consistent with established legal standards, and reached its decision through the exercise of reason." *State v. Thorngren*, 149 Idaho 729, 732, 240 P.3d 575, 578 (2010). Mr. Ellington argues that the district court never evaluated whether the inclusion of the word "homicide" in the diagram had any probative value, and therefore it abused its discretion. A review of the record indeed shows that the district court did not explicitly evaluate any probative value that the word's inclusion would have. "[T]he trial judge must measure the probative worth of the proffered evidence" in evaluating evidence under I.R.E. 403. *Davidson v. Beco Corp.*, 114 Idaho 107, 110, 753 P.2d 1253, 1256 (1987). The court did reason that the term "homicide" was not prejudicial because it was accurate and did not include inflammatory and accusatory words such as "murder scene" or "crime scene." However, because the district court failed to evaluate at all whether the word "homicide" has any probative value, and because there does not appear to be any probative value in its inclusion in the diagram, nor does the State provide this Court with any argument on the matter, we find that the district court abused its discretion.

3.    *Trooper Daly's Opinion Testimony that Mr. Ellington Acted Intentionally Was Inadmissible*

Mr. Ellington argues that the trial court abused its discretion when it allowed Trooper Daly to testify over Mr. Ellington's objection that the incident was not an "accident." He contends that this testimony does not "assist" the jury pursuant to I.R.E. 702 because the jury was capable of drawing the inference that Mr. Ellington acted intentionally on its own.

Trooper Daly is an accident-reconstruction expert. He testified as to how he reconstructs accidents, and then he explained how he had reconstructed this accident. After doing so, he expressed an opinion based on his specialization and knowledge in reconstructing the scene of a crash, that the scene indicated that Mr. Ellington was in "full control" of his vehicle. Later in his testimony, he was asked whether he was "able to determine any speeds from this accident," to which he responded "I'd like to define this as an incident, not an accident. An accident is when you're walking through the forest with your wife and a tree hits her, or your husband." No objection was made to Trooper Daly's response. During re-direct examination, Trooper Daly was asked why no attempts were made to come up with speed assessments for the Blazer, and he answered: "There isn't an accident." The defense objected to that answer, and argued outside of the presence of the jury that Trooper Daly's opinion that this was not an accident was

15

inadmissible opinion testimony. After conducting its own questioning of Trooper Daly to attempt to clarify the connection between the lack of any speed assessment and Trooper Daly's opinion that Mr. Ellington acted intentionally in hitting the Honda and Mrs. Larsen, the court determined that Trooper Daly based his opinion on the lack of any evidence of evasive action, and therefore it was admissible expert opinion testimony.[10]

Idaho Rule of Evidence 702 governs admissibility of expert testimony. It provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." I.R.E. 702. "In order to be admissible under I.R.E. 702, the expert's testimony must assist the trier of fact to understand the evidence or to determine a fact that is in issue." *Chapman v. Chapman*, 147 Idaho 756, 760, 215 P.3d 476, 480 (2009). Pursuant to I.R.E. 704, an expert's testimony is not inadmissible merely because it embraces an ultimate issue to be decided in the case; however, "[e]xpert testimony that concerns conclusions or opinions that the average juror is qualified to draw from the facts utilizing the juror's common sense and normal experience is inadmissible." *Id.* This is because "[t]he function of the expert is to provide testimony on subjects that are beyond the common sense, experience and education of the average juror." *Warren v. Sharp*, 139 Idaho 599, 606, 83 P.3d 773, 780 (2003) (quoting *Rockefeller v. Grabow*, 136 Idaho 637, 647, 39 P.3d 577, 587 (2001)).

Thus, the relevant question here is whether Trooper Daly's opinion that this was not an "accident" concerned an inference that could be drawn by the jurors utilizing their own common sense and normal experience. In *Warren*, this Court found that the accident reconstructionist's opinion testimony that the accident could have been avoided by the defendant was inadmissible. *Id.* at 606, 83 P.3d at 780.[11] It reasoned that "the jurors could have determined whether or not they thought that Mr. Warren could have avoided the accident given the facts and expert testimony, including the opinion [that Mr. Warren had control of his vehicle] presented at trial."

---

[10] Trooper Daly explained to the court outside the presence of the jury the apparent basis for his opinion:

> I built my opinion on what I have seen in photographs, the evidence I have seen on the roadway, the crush on the cars, the correlating damage to the vehicles, and I believe the speed is going to be minor just from training and experience….But the fact that there is no evasive action at each event and the fact that the Honda was pushed so hard, so far, without disengaging from the Honda and taking a different route is why I believe it was an intentional act.

[11] *Warren* was a civil case involving a wrongful death claim. *Warren*, 139 Idaho at 601, 83 P.3d at 775.

16

*Id.* Here, Trooper Daly concluded that Mr. Ellington acted intentionally because there was a lack of any evidence of evasive action, which indicated that Mr. Ellington was in full control of his vehicle. As in *Warren*, this conclusion was impermissible opinion testimony because a juror could have determined whether or not he or she thought that Mr. Ellington acted intentionally given the evidence presented; that there was a lack of any evidence of evasive action, and that Mr. Ellington seemed to be in full control of the vehicle. *See also State v. Turner*, 136 Idaho 629, 633, 38 P.3d 1285, 1289 (Ct. App. 2001) (citing *State v. Parks*, 693 P.2d 657, 659–60 (Or. Ct. App. 1985) ("I see it as analogous to the question in a civil action, 'In your opinion was the defendant negligent?' And that's objectionable, not because it's the ultimate issue to be determined by the jury, but because the witness is not better able than the jury to reach a conclusion on that issue.")) As stated in *Warren*, this type of opinion "is more suited to a closing argument than expert testimony." *Warren*, 139 Idaho at 606, 83 P.3d at 780. Thus, we find that Trooper Daly's testimony that there was "not an accident" was clearly inadmissible opinion testimony on Mr. Ellington's state of mind that was not helpful to the jury, and the district court abused its discretion in admitting it.

Further, the opinion testimony was non-responsive to the question Trooper Daly was asked, which was why he had not performed speed assessments. Trooper Daly gratuitously and unnecessarily injected his clearly inadmissible opinion that Mr. Ellington acted intentionally. Not only was his answer an inadmissible intrusion into the jury's domain of determining the defendant's state of mind, it was also completely unsolicited and wholly unnecessary. As an officer of the State, Trooper Daly's gratuitous and prejudicial response is imputed to the State, whether or not the State intended to elicit that response. Had Mr. Ellington raised this issue as another instance of prosecutorial misconduct on appeal, we would have found, once again, that the State's conduct was improper.

4. *There Was No Abuse of Discretion in Denying the Motion in Limine for Dr. Ross' Testimony*

In addition to its argument that the prosecution's offer of Dr. Ross' testimony was prosecutorial misconduct, Mr. Ellington also argues that the court abused its discretion in denying his motion in limine to preclude Dr. Ross from testifying. He argues that the probative value of Dr. Ross' testimony was substantially outweighed by the danger of both unfair prejudice and cumulative evidence because the testimony regarding Mrs. Larsen's injuries had a low probative value and was inflammatory, and thus the motion in limine should have been granted.

17

The State argues that the testimony was relevant in order to distinguish which injuries were the result of being struck and which injuries were the result of being run over, which could help the jurors place where Mrs. Larsen was in the road when she was struck and what way she might have been facing. This Court notes that a party need not make a renewed objection to the admission of evidence it has unsuccessfully attempted to exclude through a motion in limine in order to preserve that objection for appeal. *Davidson v. Beco Corp.*, 112 Idaho 560, 563–64, 733 P.2d 781, 784–85 (Ct. App. 1986), *rev'd on other grounds*, 114 Idaho 107, 753 P.2d 1253 (1987).

Thus, the issue is whether the testimony of Dr. Ross should have been excluded because of its potential prejudicial and cumulative nature. "It is well established that where allegedly inflammatory evidence is relevant and material as to an issue of fact, the trial court must determine whether the probative value is substantially outweighed by the danger of unfair prejudice." *State v. Winn*, 121 Idaho 850, 853, 828 P.2d 879, 882 (1992); I.R.E. 403. The fact that evidence may cause an emotional reaction in the jury does not automatically lead to the conclusion that the evidence should be excluded. *Winn*, 121 Idaho at 853, 828 P.2d at 882 ("The fact that the photographs depict the actual body of the victim and the wounds inflicted on the victim and may tend to excite the emotions of the jury is not a basis for excluding them.")

Dr. Ross testified as to the types of injuries Mrs. Larsen had suffered in an alleged effort to describe whether the injuries were consistent with being hit by a fast-moving car or a slow-moving car, and whether they were consistent with being struck, dragged or run over. He described, in great detail, the injuries to her torso and to her face and head. He then briefly testified that based on his observations, the injuries were more consistent with being hit by a fast-moving object than being dragged, and more consistent with being struck than run over. This was potentially relevant to where Mrs. Larsen may have been standing and if she was possibly moving, all of which had at least some probative value to the issue of whether Mr. Ellington intentionally went after her with his car or whether he hit her by accident because he did not have time to react. It was also certainly cumulative to some degree because Mrs. Larsen's injuries had already been put before the jury in photos and other testimony, though not specifically to explain the type of impact.

Although the testimony regarding the injuries was undoubtedly prejudicial to Mr. Ellington because the descriptions of the injuries were the focus of the testimony, we hold that

18

the district court did not abuse its discretion in ultimately determining at the time it ruled on the motion in limine that the prejudice did not substantially outweigh what it had determined was the probative value in the testimony. The district court weighed the probative value of the offer of proof given by the prosecutor, which was that Dr. Ross would help distinguish the injuries by explaining how each one was caused to help establish Mrs. Larsen's location on the roadway. The court also acknowledged the prejudice that describing the injuries would have, stating that much of the testimony "may very well be cumulative and unnecessary." However, the court weighed the danger of the cumulative evidence and prejudice and determined that the probative value was not outweighed, and the evidence should not be excluded in the form of barring Dr. Ross from testifying. Thus, we find that the district court did not abuse its discretion in allowing Dr. Ross to testify according to the prosecutor's offer of proof.

## C.   Biased Jury

Mr. Ellington argues that the district court erroneously denied his motion for mistrial during voir dire because the opinions expressed by three potential jurors that they believed Mr. Ellington was guilty impermissibly biased the rest of the jurors, depriving Mr. Ellington of a fair trial.

### 1.   *Standard of Review*

A "mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial." I.C.R. 29.1(a).

The standard of review of a denial of a motion for mistrial is well-settled:

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007).

### 2.   *Mr. Ellington Cannot Show That His Due-process Rights Were Violated When Three Prospective Jurors Expressed Their Opinions During Voir Dire That Mr. Ellington Was Guilty*

19

Mr. Ellington contends that his motion for mistrial should have been granted because his due-process rights were violated "when three prospective jurors tainted the entire panel of prospective jurors by expressing their preconceived views . . . that Mr. Ellington was guilty of the charged offenses." He also contends that some of the actual jurors that deliberated were not neutral, evidencing the prejudice that the prospective jurors had on the actual panel. We find that there was no error because Mr. Ellington's due-process rights were not violated.

During voir dire, the judge asked the pool of jurors if any of them had formed an opinion that Mr. Ellington was guilty. Mr. Ellington argues that the responses of the following three jurors prejudiced the entire pool. First, prospective juror Ron Dykstra stated that he had "read about it in the papers" and believed Mr. Ellington to be guilty. Immediately following that response the judge reiterated that the case is only to be decided on the evidence within the courtroom, and after Mr. Dykstra stated that he could not do so, the court excused him for cause. Next, prospective juror Jessica Welk stated that she had a conversation with a member of the Larsen family the day after the incident and she was "on her side of him being guilty." The judge stated that he did not want to engage in any factual details of the conversation, and once again reiterated that the case must be decided only on the evidence presented in the courtroom. After Ms. Welk stated that she could not be fair, she was excused for cause by the court. Finally, prospective juror Mark Felder stated that he had already formed an opinion based on the news he had read in the papers and seen on television such that he could not give Mr. Ellington a fair trial. The judge again reiterated the importance of deciding the case based on what happens inside the courtroom and not what happens outside, after which Mr. Felder stated that he could "try" to do so. Mr. Felder was not selected for the final jury.[12]

A criminal defendant has a constitutional right to trial by an impartial jury. U.S. Const. amends. V, VI, XIV; Idaho Const. art. 1, §§ 7, 13. However, even a juror's expression of his own opinion of the case during voir dire does not render him partial. A juror is presumed to be impartial.

> [T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

---

[12] One party likely exercised one of its peremptory challenges to remove Mr. Felder, however those challenges were not exercised on the record.

20

*Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S. Ct. 2273, 2277 (1988) (quoting *Lockhart v. McCree*, 476 U.S. 162, 184, 106 S. Ct. 1758, 1770 (1986)). This Court has agreed:

> The trial court does not need to find jurors that are entirely ignorant of the facts and issues involved in the case. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999) (internal citations and quotations omitted); *see also State v. Yager*, 139 Idaho 680, 688, 85 P.3d 656, 664 (2004).

None of the jurors who expressed the opinions on Mr. Ellington's guilt that are at issue on appeal actually sat on the jury. At worst, the jurors who actually deliberated received a second-hand opinion from those three prospective jurors that Mr. Ellington was guilty. They did not receive any specific facts as to why, other than that the prospective jurors read about it in the paper and in one instance interacted with a member of the Larsen family.[13] The impaneled jurors were instructed at the end of voir dire that they were to decide the case only based on the evidence presented in the courtroom. They were again instructed of this duty before their deliberations. Under the U.S. Supreme Court's and this Court's case law, Mr. Ellington has not overcome the presumption that the jury was impartial.[14] "Where a defendant does not allege or cannot demonstrate that a member of his or her jury was biased or prejudiced, a due process challenge must fail." *State v. Santana*, 135 Idaho 58, 64, 14 P.3d 378, 384 (2000).

The only allegation Mr. Ellington provides to show that an actual member of the jury was biased is that two jurors came forward during the trial and expressed concerns to the court. Once

---

[13] Prospective Juror Jessica Welk stated that when she was at the gym the day the incident happened "one of the aunts related the [sic] Larsen family told about this incident and gave her informative opinion and we had a discussion about it. So I'm unfortunately on her side of him being guilty." This was the extent of her testimony regarding her basis for her opinion.

[14] Mr. Ellington argues in his brief, as he did before the district court in bringing his motion for mistrial, that the district court used the incorrect standard in questioning of the prospective jurors during voir dire. He cites the Court of Appeals' decision in *State v. Hauser*, 143 Idaho 603, 150 P.3d 296 (Ct. App. 2006), to stand for the proposition that merely "trying" to be fair is not the standard mandated by the Constitution when the court is questioning potential jurors. *Hauser* involved a different set of facts in which a juror was *not* excused for cause after he admitted bias, but stated that he would "try" to be fair. *Id.* at 609–10, 150 P.3d at 302–03. Mr. Ellington here makes no challenge to any specific juror who was not dismissed for cause that he believes should have been. Instead he focuses his challenge on appeal on the denial of the motion for mistrial, which assigned error only in the statements of the three prospective jurors, none of whom sat on the jury. Because those prospective jurors were all dismissed, the holding of *Hauser* does not apply here.

21

again, those two jurors, one whose mother-in-law worked at the physical-therapy clinic where Jovon was receiving treatment and one who was receiving treatment at that same physical-therapy clinic assured the court that they had not discussed the case at all outside the courtroom, and reiterated that they would be able to be fair and impartial in continuing to sit on the jury. Although not always dispositive, the trial judge is entitled to rely on assurances from venire persons concerning partiality or bias. *Yager*, 139 Idaho at 688, 85 P.3d at 664. Mr. Ellington has not shown that the jurors in question were partial or biased. *State v. Tolman*, 121 Idaho 899, 902, 828 P.2d 1304, 1307 (1992) (trial court did not abuse its discretion in refusing to grant a mistrial when a juror in a molestation trial revealed during the trial that his wife was molested because the court thoroughly questioned the juror and the juror repeatedly stated he would be fair and did not think his wife's molestation would affect his judgment). Particularly within the framework of Mr. Ellington's motion for mistrial, he has not shown in any way that these actual jury members had been influenced by the three prospective jurors' statements during voir dire.

This is also not a case where Mr. Ellington has shown that bias to the impaneled jury might be presumed because of the extent of publicity during the trial. *See State v. Scroggins*, 91 Idaho 847, 848, 433 P.2d 117, 118 (1967) (mid-trial newspaper article stating other charges filed against the defendant which was discussed in the jury room did not present the degree of publicity necessary to overcome the presumption of impartiality); *see also Marshall v. United States*, 360 U.S. 310, 312, 79 S. Ct. 1171, 1173 (1959) (jury's exposure to newspaper article which was highly prejudicial to defendant necessitated new trial); *Sheppard v. Maxwell*, 384 U.S. 333, 356, 86 S. Ct. 1507, 1519 (1966) (atmosphere of a "Roman holiday for the news media," a "deluge of publicity," and "massive pretrial publicity" necessitated new trial); *Estes v. Texas*, 381 U.S. 532, 543, 85 S. Ct. 1628, 1633 (1965) (live radio and television broadcast of trial and pre-trial proceedings deprived defendant of "judicial serenity and calm to which [he] was entitled"); *State v. Hall*, 111 Idaho 827, 831, 727 P.2d 1255, 1259 (Ct. App. 1986) (denial of motions for change of venue and sequestration not an abuse of discretion because prospective jurors were not "incessantly exposed to news stories throughout the pretrial period" and the "intensity of the initial coverage was dissipated by the passage of time").

Thus, Mr. Ellington has not shown that the expressions of three prospective jurors that Mr. Ellington was guilty overcome the presumption that the impaneled jurors were impartial, and

to that end he cannot show a violation of his due-process rights. Because there was no error, the Court will not evaluate whether that error was harmless or reversible.

## D.    Cumulative Error

Mr. Ellington argues that the alleged errors during trial which are analyzed above, as well as the prosecution's "larger pattern of attempting to prejudice the jury," constitutes cumulative error that necessitates a reversal. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. However, a necessary predicate to the application of the doctrine is a finding of more than one error." *Perry*, 150 Idaho at 230, 245 P.3d at 982.

Given the multiple instances of prosecutorial misconduct and evidentiary errors, there was undoubtedly more than one error at Mr. Ellington's trial. We note that when ruling on a motion for mistrial brought after an instance of alleged prosecutorial misconduct, the district court should not limit its view of the misconduct to the specific isolated incident, but should also take into consideration whether or not the prosecutor is engaging in a pattern of misbehavior. From a review of the record in this case it seems that the prosecutor was attempting to use every opportunity possible to appeal to the passions and prejudices of the jurors, including ignoring warnings and admonitions by the judge to try the case based on the facts. While the isolated instances of misconduct and evidentiary error in this case may not rise to the level of reversible error, we implore district courts to take into account all the factors surrounding a motion for mistrial, particularly in an emotionally charged trial such as this one where there are several indicators that the prosecutor is attempting to try the case based on emotion. We do not decide whether the errors individually or cumulatively warrant a reversal here because our resolution of the motion for new trial issue discussed below is dispositive.

## E.    Motion for New Trial

Mr. Ellington argues that the district court abused its discretion in denying his motion for new trial based on newly-discovered evidence in the form of prior inconsistent testimony of the State's sole rebuttal witness, Cpl. Fred Rice.

At trial, the State called reconstruction expert and Idaho State Police Cpl. Fred Rice to the stand to rebut testimony offered by Dr. William Skelton, Jr., regarding average perception and reaction times and using crash debris to locate a point of impact. Dr. Skelton testified as an accident reconstructionist expert for the defense, and stated that there was an average perception-

reaction time of 1.5 seconds and that crash debris from the accident could be used to locate where the vehicle was on the road. This average perception-reaction time took into account that it takes .75 seconds to perceive the hazard and .75 seconds to react to the hazard. He concluded based on those facts and his reconstruction both that Mr. Ellington did not have the time to react to avoid hitting either the Honda or Mrs. Larsen, and that the debris field in the westbound lane indicated that Mr. Ellington was traveling in the correct, eastbound, lane of travel when the Blazer and the Honda collided.

During Cpl. Rice's rebuttal testimony, he stated that Dr. Skelton's 1.5 second reaction time could not be used because "there is no average perception reaction time in the world." He also testified that a debris field is not reliable in placing a vehicle at the scene because "debris can be moved, kicked around, like I said, it sprays" and that the debris field was "not going to tell me where the point of impact happened."

After the trial, Mr. Ellington filed a motion for new trial on the grounds that he had discovered new evidence that Cpl. Rice had testified inconsistently for the State in a vehicle-pedestrian collision case in the district court of Elmore County called *State v. Ciccone*, in January of 2005.[15] In that case, Cpl. Rice testified that the location of the crash debris in the form of glass "definitely coincides with where the impact point is."[16] Mr. Ellington also submitted evidence that the training materials Cpl. Rice teaches from, which he prepared himself, state that the average perception-reaction time is 1.6 seconds.[17] Cpl. Rice testified in

---

[15] The case number of that case is CR-2003-4441. Mr. Ellington submitted as newly-discovered evidence both the testimony of Cpl. Rice at the trial, which occurred on Tuesday, January 11, 2005, and the testimony of Cpl. Rice from the preliminary hearing in the same case, which took place on December 29, 2003.

[16] This testimony was consistent with Cpl. Rice's testimony in the preliminary hearing:

> Q: Were you able to determine an area of impact?
>
> A: Oh, absolutely, yes.
>
> Q. How did you make that determination?
>
> A. Well first of all, we see the tire; so we know the path that the vehicle was traveling. And we have our first headlight glass where it starts to show up on the ground. Now, knowing that an automobile was traveling when this impact took place, when the glass is broke, it is not going to fall directly to the ground; gravity has to pull it. But the glass is going to travel what the speed of the car was. So the glass is going to be located, in this case, farther to the right of what the actual impact took place. So if we just take some estimates, knowing approximately how high the glass was when it broke and things such as that, we can come back with knowing how fast the car was traveling and say, approximately, where the area of impact was.

[17] Those materials state, "*Reaction time* is the length of time from when a person perceives a given situation as being a hazard to when he reacts to his perception. When a person's reaction time is unknown, a reaction time of **1.6**

the *Ciccone* preliminary hearing that he had used a reaction time, which he clarified was only the time to react and did not include the time to perceive, of 0.75 seconds, supporting the testimony here of Dr. Skelton.[18]

1.      *Standard of Review*

This Court reviews a denial of a motion for new trial for an abuse of discretion.  *State v. Stevens*, 146 Idaho 139, 144, 191 P.3d 217, 222 (2008).  Because a motion for new trial involves mixed questions of law and fact, "[a]n abuse of discretion will be found if the trial court's findings of fact are not supported by substantial evidence or if the trial court does not correctly apply the law."  *Id.*

2.      *The District Court Correctly Applied the* Drapeau *Standard*

A defendant who has been found guilty of a crime may seek a new trial under I.C. § 19-2406 "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial."  I.C. § 19-2406(7).  "Newly discovered evidence warrants a new trial only if the defendant demonstrates: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) it will probably produce an acquittal; and (4) failure to learn of the evidence was not due to a lack of diligence on the part of the defendant."  *Stevens*, 146 Idaho at 144, 191 P.3d at 222 (citing *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976)).  "[A] defendant wishing to gain a new trial based on newly discovered evidence must show that the evidence meets all four of the requirements set out in Idaho law."  *Stevens*, 146 Idaho at 146, 191 P.3d at 224.  "Motions for a new trial based on newly discovered evidence are disfavored and should be granted with caution, reflecting the importance accorded to considerations of repose, regularity of decision making, and conservation

---

seconds may be used for investigation purposes.  This figure accounts also for any unknown perception delay and is therefore a perception-reaction time."  (italics and bold in original).

[18] He stated: "[W]e're going to say that the person has a reaction time, not perception time that I'm talking about, just reaction time. Using three quarters of a second that a person is going to react."  This is the exact same reaction time that Dr. Skelton used in his testimony that led to the ultimate conclusion that it takes 0.75 seconds to perceive and another 0.75 seconds to react, for a total average perception- reaction time of 1.5 seconds.  ("Perception reaction time is defined by a lot of associations as the time that it takes to perceive an oncoming danger or an oncoming event plus the time that it takes to react to avoid that impact or that danger or whatever is necessary.  The perception is generally accepted as three-quarters of a second. In other words, if you're driving down the road, you're going to travel for three-quarters of a second while you're seeing that there is a danger approaching. Then it takes another three-quarters of a second for you to move, to either turn your steering wheel, put your foot on the brake, do whatever you're going to go [sic]. So the total perception reaction time is generally accepted as 1.5 seconds.")

of scarce judicial resources." *Id.* at 144, 191 P.3d at 222 (citing *State v. Hayes*, 144 Idaho 574, 577, 165 P.3d 288, 291 (Ct. App. 2007)).

Mr. Ellington claims that the court abused its discretion in not applying the standard this Court adopted in *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985) to Mr. Ellington's motion for new trial. In that case, this Court stated that "*where a defendant submits an affidavit by a government witness in which the witness recants his testimony* and specifies in what ways he dishonestly testified and in what ways he would, if given the opportunity to testify again, change that testimony and where a defendant makes a showing that such changed testimony may be material to a finding of his guilt or innocence, a new trial should be held." *Scroggins,* 110 Idaho at 385, 716 P.2d at 1157 (emphasis added). The standard applied in *Scroggins* considers (1) whether the testimony given by a material witness was false; (2) whether without that testimony the jury might have reached a different conclusion; and (3) whether the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it, or, did not know it was false until after the trial. *Bean v. State*, 119 Idaho 632, 638, 809 P.2d 493, 499 (1991) (citing with approval the *Scroggins* test for new trial based upon the recantation of testimony by a witness). In *Scroggins*, the only eyewitness for the defense delivered a note to the court after the trial insinuating that he had not told the truth in his trial testimony. *Scroggins*, 110 Idaho at 384, 716 P.2d at 1156. The Court went on to hold that the note did not constitute an affidavit and even so, it was subject to multiple inferences, such that the Court could not conclude that the witness had provided evidence that he had recanted his testimony. *Id.* at 385, 716 P.2d at 1157.

The Court of Appeals recently confirmed that the language in the *Scroggins* case suggests that the use of that standard should be confined to a specific set of facts "when a trial witness has recanted his or her trial testimony and evidence of that recantation has been presented to the trial court." *State v. Griffith*, 144 Idaho 356, 366, 161 P.3d 675, 685 (Ct. App. 2007) (citations omitted); *see also State v. Lawrence*, 112 Idaho 149, 152, 730 P.2d 1069, 1072 (Ct. App. 1986) ("*Scroggins* provides the standard for evaluating recanted testimony in Idaho."). Excepting evidence of recantation, "[a]ny other type of new evidence presented by a defendant as an alleged basis for a new trial, including other types of proof of perjury and evidence of a recantation that has itself been subsequently disavowed by the trial witness, are subject to the

*Drapeau* test." *Griffith*, 144 Idaho at 366, 161 P.3d at 685 (citations omitted);[19] *see also Cootz v. State*, 129 Idaho 360, 366–67, 924 P.2d 622, 628–29 (Ct. App. 1996) (applying the *Scroggins* test to a newly-discovered affidavit from the witness which constituted a recantation, but applying the *Drapeau* test to a newly-discovered affidavit from a third party that suggested a witness had perjured himself).

This is not a situation where a government witness specifically identified that he had perjured himself on the stand, and further expressly recanted his testimony. Cpl. Rice has not submitted any affidavit, and has not presented anything to the trial court to indicate that he is recanting his testimony in the Ellington trial. While the evidence suggests he may have perjured himself, he did not recant his testimony. Therefore, the district court properly applied the *Drapeau* test.

3.    *The District Court Abused Its Discretion in Finding That the Newly-Discovered Evidence Could Only Be Used for Impeachment Purposes*

To begin, neither party argues that the district court erred in finding that the first and fourth prongs of the *Drapeau* test were met, and so we hold that the district court did not abuse its discretion in finding that the evidence was newly-discovered and could not have been discovered at the time of trial with reasonable diligence. Rather, we focus on the second and third prongs of the test, both of which the district court found that Mr. Ellington had not met.

The district court determined that the newly-discovered evidence of Cpl. Rice's completely inconsistent testimony from the *Ciccone* case and training materials Cpl. Rice had personally prepared and used was not material and would probably not produce an acquittal. Turning first to the materiality prong, the *Drapeau* test requires that the newly-discovered evidence be "material," not "merely cumulative or impeaching." *Drapeau*, 97 Idaho at 691, 551 P.2d at 978. Thus the question to be resolved on appeal is whether the district court abused its discretion in determining that Cpl. Rice's testimony in the *Ciccone* case was merely impeaching

---

[19] The Court of Appeals cited a series of cases from this Court and the Court of Appeals in which the *Drapeau* test was applied to allegations of perjury that do not rise to the level of recantation. *Griffith*, 144 Idaho at 366–67, 161 P.3d at 685–86 (citing *State v. Fields*, 127 Idaho 904, 914–15, 908 P.2d 1211, 1221–22 (1995); *State v. Ransom*, 124 Idaho 703, 711–12, 864 P.2d 149, 157–58 (1993); *State v. Welker*, 129 Idaho 805, 812, 932 P.2d 928, 935 (Ct. App. 1997); *Cootz v. State,* 129 Idaho 360, 366, 924 P.2d 622, 628 (Ct. App. 1996); *State v. Priest*, 128 Idaho 6, 15–17, 909 P.2d 624, 633–35 (Ct. App. 1995); *State v. Barlow*, 113 Idaho 573, 577–79, 746 P.2d 1032, 1036–38 (Ct. App. 1987).) The Court of Appeals also noted that there was only one case in which the *Scroggins* test was applied to evidence of perjury that was not a recantation, *State v. Dunn*, 134 Idaho 165, 170, 997 P.2d 626, 631 (Ct. App. 2000), noting it was "an apparent inadvertent aberration." *Griffith*, 144 Idaho at 367, 161 P.3d at 686. Neither this Court nor the Court of Appeals has addressed any cases on these two competing standards since *Griffith*.

and not substantive and material to Mr. Ellington's case, which is essentially an evidentiary ruling. *See Stevens*, 146 Idaho at 152, 191 P.3d at 230 (Horton, J., specially concurring) ("The second question [in the *Drapeau* test], whether the evidence is material, not merely cumulative or impeaching, appears to be a purely evidentiary question."). "When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *Foster v. Traul*, 145 Idaho 24, 28, 175 P.3d 186, 190 (2007).

The Court of Appeals has aptly described the difference between impeachment evidence and substantive evidence:

> Unlike substantive evidence which is offered for the purpose of persuading the trier of fact as to the truth of a proposition on which the determination of the tribunal is to be asked, impeachment is that which is designed to discredit a witness, i.e. to reduce the effectiveness of his testimony by bringing forth the evidence which explains why the jury should not put faith in him or his testimony. Examples of impeachment evidence would include *prior inconsistent statements*, bias, attacks on [the] character of a witness, prior felony convictions, and attacks on the capacity of the witness to observe, recall or relate. Evidence may be both substantive and impeaching.

*State v. Marsh*, 141 Idaho 862, 868–69, 119 P.3d 637, 643–44 (Ct. App. 2004) (quoting *Small v. State*, 132 Idaho 327, 334–35, 971 P.2d 1151, 1158–59 (Ct. App. 1998)) (emphasis added).

"One recognized method of impeachment is by showing that on a prior occasion, the witness made a statement inconsistent with testimony he gave at trial." *Drapeau*, 97 Idaho at 688, 551 P.2d at 975; I.R.E. 613(b). In Idaho, a prior inconsistent statement can also be used as substantive evidence, so long as the declarant testifies at trial, is subject to cross-examination concerning the statement, and the statement was given under oath at a prior proceeding. I.R.E. 801(d)(1). Cpl. Rice testified at trial, was subject to cross-examination, and gave the prior inconsistent statements while under oath during the preliminary hearing and trial in the *Ciccone* case, thus, his testimony would have been admissible as substantive evidence.

Black's Law Dictionary defines "material evidence" as that evidence "[h]aving some logical connection with the consequential facts." Black's Law Dictionary 1066 (9th ed. 2009). Mr. Ellington argues that the evidence is not merely impeaching because "it would have provided substantive support for Dr. Skelton's calculations and opinions." We agree. Cpl. Rice's testimony and training materials used in the *Ciccone* trial could have been offered not only to attack Cpl. Rice's credibility, but also to lend more support to the conclusions Dr. Skelton had made, and which Cpl. Rice was attacking, that given Dr. Skelton's statement that the

28

average perception-reaction time is 1.5 seconds (.75 seconds for perception and .75 seconds for reaction), Mr. Ellington did not have time to react and avoid the Honda or subsequently, Mrs. Larsen.  Further, the evidence would lend support to the use of a debris field to locate a point of impact, further bolstering Dr. Skelton's testimony that the impact with the Honda occurred in the correct, eastbound, lane.  This would also make it more likely that Mr. Ellington did not act intentionally because he did not travel across the center line before the collision.  Not only is this evidence material, it goes directly to the main question at trial, which was whether Mr. Ellington acted with implied malice.  Thus, the district court abused its discretion in determining that the evidence was only impeaching and not material, because it was *both* impeaching evidence and material substantive evidence.

While we hold that in Mr. Ellington's case the newly-discovered evidence was not merely impeaching or cumulative and did meet the *Drapeau* standard, we also hold that in the particularly egregious case of perjury by a State officer, a defendant will receive a new trial even if that evidence is merely impeaching or cumulative.  That is, if a state law enforcement officer perjures himself by making statements that are prejudicial to the defendant, the prong of the *Drapeau* test requiring the defendant to show that the evidence is material substantive evidence that is not merely impeaching or cumulative, need not be satisfied.

4.  *The District Court Abused Its Discretion in Determining That Mr. Ellington Could Not Show That the Newly-Discovered Evidence Would Probably Produce an Acquittal*

The district court reasoned that there was evidence beyond a reasonable doubt of intent to support the aggravated battery counts and implied malice to support the second-degree murder count in the form of the altercation that occurred with the girls earlier in the day, the 911 tape, and what it perceived as the ineffective testimony of Cpl. Rice,[20] such that the newly-discovered evidence was "merely speculative" and "would not alter the outcome," and accordingly it would not probably produce an acquittal.  While the district court clearly perceived its discretion, we find it did not act within the bounds of its discretion because the defense's entire theory at trial rested on the testimony of Dr. Skelton that Mr. Ellington did not have the time to perceive and

---

[20] The district court noted in its decision, "From the perception of the court it is likely that the only one impressed with the testimony of Fred Rice was Fred Rice."

29

react to the Honda or Mrs. Larsen, and thus he did not act intentionally in hitting either.[21] The newly-discovered evidence provides support directly to the core of that theory. Further, the newly-discovered evidence provides very compelling evidence that Cpl. Rice perjured himself during the Ellington trial.

Cpl. Rice, a police officer with twenty five years of experience, who teaches accident reconstruction to other Idaho police officers and who has testified for the State on many other occasions regarding accident reconstruction, took the stand and attacked Dr. Skelton's testimony, derailing its credibility in the eyes of the jurors. Cpl. Rice was also not merely expressing his opinion on the usefulness of debris fields and average perception-reaction times in this case as the State attempts to argue, he was emphatically stating that a debris field could not be used to locate a point of impact, and that an average perception-reaction time does not exist. He testified falsely according to the well-established principles of accident reconstruction Dr. Skelton had already testified to as well as his own testimony in the *Ciccone* case and his own training materials. He was not uninformed or ignorant as to these principles; he was well aware of them, testified to them in *Ciccone*, published them, and taught them to other police officers. While the record does not indicate whether Cpl. Rice was wearing his uniform at trial, we know that he was

---

[21] Mr. Ellington's Opening Statement was focused on the idea that Mr. Ellington did not have time to perceive and react:

> Skeltons will tell you about perception and reaction time. There is a time to see something and be able to make your body react to it. Mr. Ellington had no time when that Subaru threw that Blazer into the Honda to perceive the Honda's presence and to hit his brakes and react to it.

"He simply did not have time to see Mrs. Larsen and react to her presence while he was trying to get away from the gunshot." Mr. Ellington's Closing Argument emphasized Dr. Skelton's testimony and once again emphasized the defense's theory that Mr. Ellington did not have the time to perceive and react to the Honda or Mrs. Larsen.

> Dr. Skelton talked to but [sic] perception reaction time. It's been accepted for years and years and years that one and-a-half seconds is perception and reaction time. That's how long it takes to a [sic] danger and react to the presence of the danger. . . . Perception reaction time is the time you see something in front of you and can react. That your brain can make your body take an action against that. That's very critical in this particular case.
>
> . . . .
>
> If you go to a further instruction, malice is defined as an intentional act with disregard to the consequences of that act. You would have to believe that Mr. Ellington intentionally drove his vehicle at Mrs. Larsen and intended to hit her. There simply wasn't time for him to do that. Dr. Skelton told you that he had a half a second to less than three-quarter second time from leaving the Honda until she was struck. And the less than three-quarter second places her in the position where it's the closest distance, not counting the carry distance because of gravity. That's not even time to complete perception, and certainly there's no time to react to her presence there. Mr. Ellington can not [sic] be found guilty of Second Degree Murder, there simply wasn't time for him to intend to drive his vehicle at her.

presented to the jury as an Idaho State Police Officer as well as a training officer at the Police Academy regarding accident reconstruction. Under such circumstances, it is not unlikely that the jury would place a great deal of reliance upon his testimony. He has taught for many years and reconstructed hundreds, if not thousands, of accidents. It is not unusual for a jury to place more reliance upon a state police officer of his stature than they would place on a privately retained accident constructionist such as Dr. Skelton.

Had the defense been able to both impeach Cpl. Rice's statements with his own inconsistent statements at a previous trial as well as with the information contained within his own training manuals for the ISP, and at the same time lend support to its theory of the case by bolstering Dr. Skelton's testimony regarding perception-reaction times and debris fields, the jurors would have been presented with a very different picture of what was already a very close case. The jury would have been given more evidence to support the theory that Mr. Ellington did not have time to react to the Honda, that the crash occurred in Mr. Ellington's correct eastbound lane as he was trying to flee while being shot at by unknown assailants, and that Mr. Ellington did not have time to react to Mrs. Larsen's presence in the road. It simply cannot be said that it was not probable that this new evidence that showed Cpl. Rice testified falsely, and likely intentionally, in the Ellington trial would have affected the jury's determination of reasonable doubt, because it went straight to the heart of the defense's main theory of the case.

We also note that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair" as a violation of due process. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976). We have no way to know whether or not the prosecutor had any knowledge of the falsity of Cpl. Rice's testimony given his past testimony and training materials, but we recognize the serious constitutional implications of the possibility. It is extremely disturbing to this Court that an officer of the law would present false testimony in any case, especially a murder case. In this case, however, it is impossible to believe there was any truth to the testimony of Cpl. Rice. It is abhorrent to this Court, as it would be to any other court, that a man can be sentenced to twenty-five years for second-degree murder based primarily on the false testimony of a trooper of this State.

For these reasons, we find that the district court abused its discretion in failing to grant Mr. Ellington a new trial.

## V. CONCLUSION

We find merit in several of Mr. Ellington's assignments of error at trial. However, we hold that the district court abused its discretion in denying Mr. Ellington's motion for new trial. Because our resolution of the new trial issue is dispositive, we do not reach the issue of whether each trial error was reversible or whether there was cumulative error. Mr. Ellington's conviction and sentence are vacated, and his case is remanded to the district court for a new trial.

Chief Justice EISMANN, Justices BURDICK, J. JONES and HORTON, **CONCUR.**