# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 42923

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2016 Opinion No. 33** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed:  June 8, 2016** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **SAMUEL C. NEYHART,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County.  Hon. G. Richard Bevan, District Judge.

Judgment of conviction for three counts of lewd conduct with a minor under sixteen, affirmed.

Sara B. Thomas, State Appellate Public Defender; Erik R. Lehtinen, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

Samuel C. Neyhart appeals from the district court's judgment of conviction on three counts of lewd conduct with a minor under sixteen.  Neyhart raises three issues on appeal.  First, he argues there was insufficient evidence to support his convictions.  Next, he maintains the prosecutor committed misconduct by commenting on Neyhart's silence at trial.  Last, Neyhart contends the prosecutor committed misconduct by using an inadmissible hearsay document for impeachment purposes, and the district court erred by allowing the prosecution to use the document without laying a proper foundation.  For the reasons explained below, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2010, the mother of a six-year-old girl reported to authorities that Neyhart had sexually molested her daughter, K.S.  The police investigated the allegations, conducting

interviews with K.S., Neyhart, and other individuals. In June 2013, Neyhart was charged with three counts of lewd conduct with a minor under sixteen, Idaho Code § 18-1508.[1] The State specifically accused Neyhart of engaging in genital-genital contact with K.S.

During the trial, the State presented testimonial evidence from a number of witnesses. K.S. testified that her uncle, Neyhart, sexually molested her in his fifth-wheel trailer on three separate occasions. Her testimony revealed that in each instance, the sexual contact took place in Neyhart's bed where he "messed with [her] bottom." She testified that on the third occasion, which took place on Friday, October 29, 2010, Neyhart "started messing" with her while they were in bed and under the covers. Neyhart then "peed in [her] underwear," which made her underwear wet. K.S.'s mother testified that K.S. told her what had happened with Neyhart on Sunday, October 31. The mother explained that she then examined K.S.'s body and discovered fingerprint-shaped bruises on her legs. She also noticed that K.S.'s vagina was "very red." She took photos of K.S.'s body and gave the photos to the police. A detective then testified that on November 6, 2010, K.S.'s father turned over the clothing K.S. had been wearing on October 29 to the police. These items included a pair of junior-sized pink underwear featuring images of monkeys. Forensic scientists then testified that the pink underwear tested positive for the presence of semen and that the semen on the pink underwear matched the profile generated from an oral swab taken from Neyhart. Finally, the pediatrician that had evaluated K.S. during a CARES (Child at Risk Evaluation Services) interview on November 2 testified about what K.S. had said during the interview. The pediatrician also testified that, during a physical evaluation, she observed bruising on the upper inner part of K.S.'s thighs.

---

[1]    Idaho Code § 18-1508 reads:

> Any person who shall commit any lewd or lascivious act or acts upon or with the body or any part or member thereof of a minor child under the age of sixteen (16) years, including but not limited to, genital-genital contact, oral-genital contact, anal-genital contact, oral-anal contact, manual-anal contact, or manual-genital contact, whether between persons of the same or opposite sex, or who shall involve such minor in any act of bestiality or sado-masochism as defined in section 18-1507, Idaho Code, when any of such acts are done with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person, such minor child, or third party, shall be guilty of a felony and shall be imprisoned in the state prison for a term of not more than life.

The State also presented physical evidence for the jury to consider. The State showed the jury the articles of clothing K.S. was wearing on October 29, including the pink underwear; played a recording of the CARES interview between K.S. and the pediatrician; and provided the pictures taken by K.S.'s mother. Additionally, the State played two recordings showing the police interviews of Neyhart conducted in 2010 and 2013.

The defense presented testimonial evidence from Neyhart's wife, Neyhart's mother, and Neyhart himself. Neyhart's wife testified that the junior-sized pink underwear with the monkeys belonged to her and that Neyhart's semen was on the underwear because they had been intimate on the day she wore them. She also testified that she had previously observed K.S.'s parents discipline K.S. by pinching her thighs, and she had observed K.S.'s vaginal area being red and bleeding prior to the alleged sexual contact. Then, Neyhart's mother testified that she saw K.S.'s aunt near Neyhart's trailer a few days after the alleged sexual contact and that the aunt was carrying what appeared to be rolled up panties in her hand. Neyhart then testified as to his version of events on the days in question, asserting he never laid in bed with K.S., and he never had any sexual contact with her. He also testified that the pink panties belonged to his wife.

Numerous times during trial, the prosecutor called into question why Neyhart and his wife both waited until trial to come forward with information that, while assisting K.S. in using the bathroom, Neyhart's wife had observed K.S.'s vaginal area as being "red and sore" and "bleeding" prior to the alleged sexual contact. The prosecutor also questioned why they both waited until trial to reveal that the semen-stained pink underwear belonged to Neyhart's wife. The prosecutor similarly questioned Neyhart's mother as to why she waited until trial to come forward with information that she had seen K.S.'s aunt carrying panties near Neyhart's trailer shortly after the alleged sexual contact.

At one point during trial, the prosecutor attempted to discredit Neyhart with his pretrial statement to police investigators that he was taking Cymbalta, a prescription medication that allegedly caused him to experience semen leakage. During the police interview, Neyhart had suggested that his leakage issue might explain how his semen ended up on K.S.'s underwear. The prosecutor used a document she referred to as his "pharmacy record" to show that Cymbalta was absent from the record's list of medications prescribed during the relevant time period. Neyhart's counsel objected several times to the prosecutor's use of this document, arguing that it improperly assumed facts in evidence and was inadmissible hearsay. The prosecutor repeatedly

responded that she was using the document to refresh Neyhart's memory. The district court overruled each objection and allowed the prosecutor to use the document.

Ultimately, a jury returned a verdict of guilty on each of the three counts of lewd conduct with a minor. Neyhart filed a renewed motion for judgment of acquittal and a motion for a new trial or mistrial. The district court denied both motions, and Neyhart filed a motion for reconsideration. Again, the district court denied Neyhart's motion. Neyhart was sentenced to three concurrent life sentences, with ten years determinate. Neyhart filed an Idaho Criminal Rule 35 motion for reduction of his sentences, which was denied. Neyhart timely appeals from the district court's judgment of conviction.

## II.

## ANALYSIS

### A. Sufficiency of the Evidence

Neyhart first argues there was insufficient evidence to support the jury's finding of guilt on each of the three counts of lewd conduct with a minor. Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

Neyhart maintains the State failed to present sufficient evidence that genital-genital contact occurred. He points to the following exchange between the prosecutor and K.S. at trial to demonstrate that K.S. could not distinguish between Neyhart's genitalia and his buttocks or anus:

Q:      And what did you do after that?
A:      He messed with me.
Q:      What do you--what do you mean by "messed"?
A:      He messed with my bottom.

4

Q:     And what did he do to your bottom?
A:     He messed with it.
Q:     Did he pinch it?
A:     No.
Q:     Did he spank it?
A:     No.
Q:     What touched--what touched your bottom to be messed with?
A:     His bottom.
Q:     And is--what does he do with his bottom?
A:     He pushed against it.
Q:     So on [Neyhart], his bottom, what does his bottom do when he goes to the bathroom?
A:     Pee and poop.

From that dialogue, Neyhart argues that the State failed to establish that he touched K.S.'s genitalia with his genitalia. Neyhart further notes that K.S. never saw what touched her and did not know whether what was touching her was soft or hard. And, while K.S. informed law enforcement that Neyhart touched her with his "private," there was never clarification as to what "private" meant. Lastly, Neyhart maintains the presence of semen on K.S.'s underwear does not necessarily mean Neyhart's genitalia touched her, since genital-genital contact is not required for Neyhart to discharge semen.

The record reflects, however, the jury in fact had sufficient evidence to find Neyhart guilty of lewd conduct with a minor. The evidence in this case includes the victim's testimony that Neyhart got into bed with her on three separate occasions while inside Neyhart's trailer. On the first occasion, Neyhart "kind of yelled at [her]" to get into the bed. K.S. testified that on each occasion, he would remove her tights and they would lie on their sides facing each other under the covers. K.S. also testified that while facing Neyhart in bed, he would lift her leg over his hip and begin to push against her "bottom" with his "bottom." She testified that Neyhart "messed with" her "bottom" on each of the three occasions.

K.S. explained to the jury that a person's "bottom" was where people pee from, whereas a person's "backside" is where people poop. The prosecutor motioned to her pelvic region, asking if that was a person's "bottom." K.S. responded affirmatively. The prosecutor then motioned to her buttocks, asking what that part was called. K.S. replied, "Backside." Thus, the record demonstrates that K.S. at times referred to genitalia as a "bottom."

Additionally, K.S. testified that on the third occasion, Neyhart "peed in [her] underwear" while she was wearing them and while Neyhart was pushing himself against her. She testified

5

that she knew he peed in her underwear "because it was wet." A forensic scientist identified semen on a pair of junior-sized pink underwear with monkey images that K.S.'s father gave to the police on November 6, 2010. Another forensic scientist compared the profile from the semen present on the pink underwear to the profile he generated from an oral swab taken from Neyhart--the profiles matched.

K.S.'s mother testified that on October 31, two days after K.S. was with Neyhart, she noticed K.S.'s vagina was "very red." She also observed small or medium sized round bruises that looked like fingerprints on K.S.'s legs. She took photos of what she observed and provided those pictures to police. K.S.'s mother also testified that she purchased the pair of pink underwear for K.S.

The jury also heard testimony from the pediatrician that evaluated K.S. during the November 2 CARES interview. The pediatrician testified that during the interview, K.S. told her something bad or something that made K.S. feel sad happened to her in Neyhart's bed in his trailer. K.S. told the pediatrician that Neyhart "rubbed up there." K.S. told the pediatrician, "He was wearing his clothes. I was wearing mine. Then he peed in my underwear." The pediatrician further testified that K.S. indicated Neyhart pulled her dress up, laid down on his side facing her, told her to roll over, and put her leg up on him. K.S. "then felt him pee" and told the pediatrician, "he did it to me every time I was there." During a physical evaluation, the pediatrician observed bruising on the upper inner part of K.S.'s thighs.

Apart from testimonial evidence, the jury also watched the videos of the CARES interview with K.S., saw the photographs of K.S. taken by K.S.'s mother, and observed the articles of K.S.'s clothing worn on the day of the alleged sexual contact. Based on the testimony and evidence presented at trial, a reasonable jury could have found, and indeed did find, that Neyhart was guilty of lewd conduct with a minor under sixteen, specifically for engaging in genital-genital contact with K.S.

Turning to Neyhart's argument that the term "private" was never clarified to determine what K.S. meant when using the term, it is the province of the jury to determine what the witness meant by an ambiguous phrase, and we will not substitute our view for that of the jury as to the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 922 P.2d at 1001; *Decker*, 108 Idaho at 684, 701 P.2d at 304. For instance, in *Crawford v. State*, ___ Idaho ___, ___ P.3d ___ (2016), the defendant argued there was insufficient evidence to support his

6

conviction for lewd contact against a minor (specifically, manual-genital contact) because the victim testified that he touched her "outside of [her] vaginal area," which does not constitute manual-genital contact. The Supreme Court found his argument unavailing, reasoning that the phrase "outside of my vaginal area" is an ambiguous phrase, susceptible of more than one reasonable interpretation. *Id.* at ___, ___ P.3d at ___. The Court noted that because it is required to consider the evidence in the light most favorable to the State, "[t]his means that when reviewing ambiguous testimony on appeal, we resolve the ambiguity in a fashion that supports the judgment below." *Id.* at ___, ___ P.3d at ___. Here too, assuming "private" is an ambiguous term, we must resolve the ambiguity to support the guilty verdicts.

Moreover, when considering trial evidence, jurors are permitted to take into account matters of common knowledge and experience. *State v. Espinoza*, 133 Idaho 618, 622, 990 P.2d 1229, 1233 (Ct. App. 1999). It is common knowledge that children refer to genitalia as "privates" or "private parts." Therefore, in sum, there was substantial evidence upon which the jury could have found Neyhart guilty, beyond a reasonable doubt, of genital-genital lewd conduct with a minor.

## B. Right to Silence

Next, Neyhart argues that the State committed fundamental error when the prosecutor questioned him about his failure to give police certain information during the course of their investigation. Neyhart contends that he had invoked his right to silence during two interviews with officers; thus, the State was not permitted to comment on the fact that he did not reveal certain information to officers during those interviews. The two interviews at issue are a 2010 pre-arrest, pre-*Miranda*[2] interview with Detective White and Detective Duch ("2010 interview") and a 2013 post-arrest, post-*Miranda* interview with Detective Joslin ("2013 interview").

At trial, Neyhart chose to testify on his own behalf, maintaining his innocence. On cross-examination, the prosecutor questioned Neyhart as to why he did not tell police during the 2010 interview that his wife had observed K.S.'s genitals as being red. The prosecutor also questioned Neyhart as to why he waited until trial to assert that the pink underwear belonged to his wife. During closing arguments, the prosecutor commented on whether it was reasonable for Neyhart to wait until trial to tell anyone that the underwear belonged to his wife.

---

[2]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Neyhart did not object to this line of questioning or the closing comment during trial. Generally, issues not objected to below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). Idaho decisional law, however, has long allowed appellate courts to consider a claim of error to which no objection was made below if the issue presented rises to the level of fundamental error. *See State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007); *State v. Haggard*, 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). In *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), the Idaho Supreme Court abandoned the definitions it had previously utilized to describe what may constitute fundamental error. The *Perry* Court held that an appellate court should reverse an unobjected-to error when the defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Id.* at 226, 245 P.3d at 978.

As to the first *Perry* prong, Neyhart maintains that the prosecutor's comments violated his constitutional rights under both the United States Constitution and the Idaho Constitution. The Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 13 of the Idaho Constitution, guarantee a criminal defendant the right not to be compelled to testify against himself. This guarantee also bars prosecutors from commenting on a defendant's invocation of his or her right to silence. *Griffin v. California*, 380 U.S. 609, 613-14 (1965). Commenting on a defendant's refusal to answer questions or provide information can constitute an impermissible comment on a defendant's silence. *See State v. Galvan*, 156 Idaho 379, 385, 326 P.3d 1029, 1035 (Ct. App. 2014).

A defendant's decision to exercise his or her constitutional right to remain silent pre-custody cannot be used in the State's case-in-chief solely for the purpose of inferring guilt. *State v. Ellington*, 151 Idaho 53, 60, 253 P.3d 727, 734 (2011) (noting that the protection attaches upon custody, not arrest or interrogation); *see also State v. Ehrlick*, 158 Idaho 900, 920, 354 P.3d 462, 482 (2015), *State v. Parker*, 157 Idaho 132, 147, 334 P.3d 806, 821 (2014); *State v. Moore*, 131 Idaho 814, 820-21, 965 P.2d 174, 180-81 (1998). This is because a defendant's constitutional protections are always available regardless of whether the defendant has received *Miranda* warnings and regardless of whether the defendant is in custody. *Moore*, 131 Idaho at 820, 965 P.2d at 180. However, a prosecutor may use a defendant's pre-*Miranda* silence, either

8

pre- or post-custody, as impeachment evidence against the defendant. *Fletcher v. Weir*, 455 U.S. 603, 607 (1982); *Parker*, 157 Idaho at 147, 334 P.3d 15 821; *Ellington*, 151 Idaho at 60, 253 P.3d at 734. But, once a defendant is given *Miranda* warnings, any subsequent invocation of his or her right to silence may not be used to later impeach the defendant during trial. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). To assert the privilege against self-incrimination, the defendant must expressly invoke the right to remain silent. *Salinas v. Texas*, ___ U.S. ___, ___, 133 S. Ct. 2174, 2181-84 (2013). However, "[n]o ritualistic formula is necessary in order to invoke the privilege." *Quinn v. United States*, 349 U.S. 155, 164 (1955).

First, regarding the prosecutor's references to Neyhart's failure to provide the investigating officers with certain information during the 2010 interview, the parties do not dispute that Neyhart never received *Miranda* warnings before or during that interview. At numerous times during the interview, Neyhart told officers that he did not want to answer their questions without first speaking with an attorney. Neyhart contends his request for an attorney was sufficient to invoke his constitutionally protected right to remain silent. The State contends, however, that Neyhart could not invoke his right to remain silent under *Miranda* because he was not in custody.[3] Even if we are to assume, without deciding, that Neyhart's request to speak to an attorney was a proper invocation of his constitutional right to silence, we hold that the prosecutor's questioning was nonetheless proper use of pre-*Miranda* impeachment evidence.

Prosecutors may impeach the credibility of a defendant during cross-examination by asking the defendant to explain prior inconsistent statements and actions. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). "Once a defendant decides to testify, '[t]he interest of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'" *Id.* (quoting *Brown v. United States*, 356 U.S. 148, 156 (1958)). "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Fletcher*, 455 U.S. at 607.

A prosecutor can properly impeach a defendant regarding his or her pre-*Miranda* failure to come forward with relevant information regarding alleged criminal conduct. *Jenkins*, 447

---

[3] The State argues that the constitutional protections afforded by *Miranda* cannot be invoked anticipatorily before a defendant is in custody.

U.S. at 238. In *Jenkins*, a defendant on trial for first degree murder testified that he had killed the victim in self-defense. *Id.* at 233-35. During cross-examination of the defendant, the prosecutor elicited the defendant's admission that he had waited two weeks before reporting the incident to authorities. *Id.* This line of questioning was the prosecutor's attempt to impeach the defendant's credibility by suggesting that he would have spoken out sooner if he had truly acted in self-defense. *Id.* at 235. The United States Supreme Court held that the prosecutor's impeachment of the defendant's credibility during cross-examination neither violated the defendant's Fifth Amendment right to silence nor deprived him of fundamental fairness guaranteed by the Due Process Clause. *Id.* at 238.

As to the prosecutor's questioning of Neyhart on his failure to tell investigators about his wife's observations of K.S.'s vaginal area, the prosecutor was attempting to use this evidence to impeach Neyhart's credibility. During trial, Neyhart's wife revealed that she had observed K.S.'s vaginal area as being "red and sore" and "bleeding" prior to the alleged sexual contact. Then during cross-examination, Neyhart revealed that he knew about his wife's observations at the time of the 2010 interview. The prosecutor repeatedly questioned Neyhart as to why he did not provide that information to police investigators prior to coming to trial. Just as the prosecutor in *Jenkins* was constitutionally permitted to impeach the defendant's credibility with evidence of his failure to come forward with information pertaining to the crime, the prosecutor here could properly impeach Neyhart's credibility based on his failure to come forward with relevant information pertaining to the alleged crime.

Moreover, as to the statements about the ownership of the pink underwear, during the 2010 interview, Neyhart had suggested a variety of explanations about how his semen might have gotten onto K.S.'s underwear. He proffered that his semen might have transferred from his sheets to her underwear when she laid down in his bed. He also suggested because he suffered from semen leakage, his semen might have transferred to her underwear when she used his toilet in the trailer. At no time during the interview did Neyhart challenge whether the semen-stained underwear belonged to K.S. Then, for the first time at trial, the defense presented testimony that the underwear belonged to Neyhart's wife.

During trial, the prosecutor neither expressly stated nor implied that Neyhart had refused to answer police questions or otherwise asserted his right to silence. Instead, her questions and closing arguments implied that Neyhart had left important information out of his interviews with

10

police, choosing instead to come forward with that information at trial. It was Neyhart, not the prosecutor, who indicated that he did not tell police that information because he had refused to cooperate further without consulting an attorney. Although the prosecutor's questioning had the effect of eliciting this testimony, the purpose of the prosecutor's questioning was to draw attention to the discrepancies between Neyhart's trial testimony and his statements to police during the 2010 interview. In asking why Neyhart had not come forward to investigators with information that the underwear belonged to his wife, the prosecutor was attempting to impeach the credibility of Neyhart's trial testimony. Because the prosecutor used the evidence to impeach Neyhart's credibility at trial, Neyhart has failed to show a constitutional violation of his right to silence as to the 2010 interview.

Second, regarding the prosecutor's reference to Neyhart's silence during the 2013 interview, it is undisputed that Neyhart was properly *Mirandized* at the time of the interview. Thus, the State would have been prohibited from commenting on Neyhart's silence either in its case-in-chief or as impeachment during cross-examination. *Ellington*, 151 Idaho at 60, 253 P.3d at 734. The State argues, however, that Neyhart never expressly invoked his right to silence during the interview, as is required under *Salinas*.[4]

Here, nothing in the record indicates that Neyhart made any attempt to invoke his right to silence during the 2013 interview. Neyhart provided a response to each question asked by the officer. Neyhart never indicated a desire to remain silent and never asked for or referenced speaking to an attorney. Neyhart was fully cooperative and responsive throughout the entire interview. Because Neyhart did nothing to affirmatively assert his right to remain silent during the 2013 interview, he cannot now rely on the constitutional privilege against self-incrimination.

Because Neyhart has failed to establish a constitutional violation under the first prong of *Perry*, we need not address the second and third prongs. Therefore, we conclude that Neyhart has not established fundamental error as relates to his claim that the prosecutor improperly commented on his right to silence.

---

[4] Neyhart does not argue that his failure to affirmatively assert his right to remain silent falls under one of the exceptions recognized in *Salinas v. Texas*, ___ U.S. ___, ___, 133 S. Ct. 2174, 2179-80 (2013). Moreover, those exceptions are not applicable to the facts in this case.

11

**C. Pharmacy Record**

Finally, Neyhart asserts that the district court erred in allowing Neyhart's pharmacy record to be admitted during trial. He also contends that the prosecutor committed misconduct by vouching for the accuracy and contents of the record.

During trial, the prosecutor presented Neyhart with a document that she referred to as Neyhart's pharmacy record. She attempted to show that the pharmacy record did not list Cymbalta as one of Neyhart's prescriptions despite his pretrial contention to investigators that he was taking the medication and it had caused him to experience semen leakage. Neyhart objected to the prosecutor's use of the pharmacy record, stating: "Your Honor, I'm going to object as assuming facts in evidence. I have never been provided this document. I have no way to determine if what she's saying is correct. It has not been admitted." The prosecutor responded that she was not admitting the evidence, but merely using the document to "refresh [Neyhart's] memory." The district court overruled the objection. Defense objected three additional times, two of those objections asserting hearsay. The district court allowed the prosecutor's use of the document, at one point stating the document was "not for the truth in any way. It's impeachment."

In its briefing, the State does not argue the document was properly admitted. Rather, the State argues that even if admission of the evidence was improper, the prosecutor could not have committed misconduct by conducting her actions in conformance with the court's rulings, and any error related to the admission of or reference to the document was harmless. Even if we are to assume, without deciding, that the admission and use of the pharmacy record was improper, such error is not reversible unless it is prejudicial. *See Ellington*, 151 Idaho at 59, 253 P.3d at 733; *State v. Stoddard*, 105 Idaho 169, 171, 667 P.2d 272, 274 (Ct. App. 1983). Where a defendant meets his or her initial burden of showing that a constitutional violation has occurred, the State has the burden of demonstrating to the appellate court beyond a reasonable doubt that the violation did not contribute to the jury's verdict. *Perry*, 150 Idaho at 227-28, 245 P.3d at 979-80. The United States Supreme Court has explained that:

> To say that an error did not contribute to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later to have been erroneous. . . . To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

*Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled in part on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991). A conviction will not be set aside for small errors or defects that have little, if any, likelihood of having changed the results of the trial. *State v. Pecor*, 132 Idaho 359, 367-68, 972 P.2d 737, 745-46 (Ct. App. 1998). Therefore, the question before this Court is whether the complained-of error contributed to the verdict, or whether it was unimportant in relation to everything else the jury considered on the issue of Neyhart's credibility.

In *State v. Joy*, 155 Idaho 1, 304 P.3d 276 (2013), a husband and wife were involved in a domestic altercation, after which charges were brought against the husband. At trial, the court improperly admitted evidence of the defendant's prior misconduct despite the defendant's objection. *Id.* at 4, 304 P.3d at 279. On appeal, the State acknowledged that the evidence securing the conviction was "relatively weak" and the credibility of the wife was an issue, but argued that inclusion of the inadmissible evidence was harmless. *Id.* at 12, 304 P.3d at 287. The Supreme Court disagreed, holding that because the case hinged upon the conflicting testimony of the husband and wife, the only two witnesses, and upon whose version of events the jury believed, the State had not shown beyond a reasonable doubt that the verdict was unaffected by the error. *Id.*

At first blush, this case appears to be similar to *Joy* in that the allegations underlying the conviction involve a he-said, she-said accounting of events. In such a situation, Neyhart's credibility, specifically his version of the facts, would be critical to his defense that the alleged sexual contact never occurred. However, the way in which this case differs from *Joy* is significant--the State's presentation of evidence corroborating K.S.'s testimony. Unlike *Joy*, the success of the State's case against Neyhart did not hinge primarily upon the impeachment of Neyhart's version of events. Instead, the jury considered testimonial evidence from multiple witnesses as well as physical evidence of bruising, vaginal redness, and junior-sized underwear with Neyhart's semen on them. Thus, the jury was able to weigh more than merely the testimony of K.S. against that of Neyhart in considering the issue of Neyhart's credibility.

Throughout trial, the State presented substantial evidence challenging Neyhart's credibility. The State impeached Neyhart's trial testimony with evidence of his prior inconsistent statements to police investigators. The State also challenged the veracity of Neyhart's wife and mother, each of whom testified favorably to Neyhart. Most importantly, the

13

complained-of error was immaterial to the issue of Neyhart's credibility. The complained-of error ultimately resulted in the impeachment of Neyhart's pretrial assertion that a side-effect of his prescription medication caused him to leak semen and that K.S. could have gotten his semen on her underwear by using his toilet. As the State argues, the issue of semen leakage became moot during trial when Neyhart and his wife both testified that the underwear belonged to Neyhart's wife, not to K.S. Therefore, the State's attempted impeachment of Neyhart's testimony that he was taking the prescription medication at the time of the alleged sexual contact was immaterial, and in his briefing on appeal, Neyhart acknowledges its immateriality.

Because the complained-of error was immaterial to Neyhart's credibility or his defense and because the State presented substantial evidence throughout trial challenging Neyhart's credibility, we hold that any error in admitting or using the pharmacy record was unimportant in relation to everything else the jury considered. Therefore, even if the district court and prosecutor erred, any such error was harmless beyond a reasonable doubt.

## III.

## CONCLUSION

Neyhart has not shown that there was insufficient evidence to support his convictions because there was substantial evidence upon which the jury could find Neyhart guilty beyond a reasonable doubt. Furthermore, Neyhart has not shown that his constitutional right to silence was implicated by the prosecutor's questioning and comments at trial. As to the 2010 interview with police, the prosecutor properly used Neyhart's failure to come forward with information pertaining to the offense as impeachment. As to the 2013 interview, Neyhart never invoked his right to silence. Finally, to the extent that the pharmacy record may have been improperly admitted or used, any error was harmless in light of its immateriality and in light of the cumulative evidence the jury considered. Accordingly, Neyhart's judgment of conviction for three counts of lewd conduct with a minor under sixteen is affirmed.

Chief Judge MELANSON and Judge HUSKEY **CONCUR**.